# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

Case No.: 12-cv-6909 (LTS) (SN)
ECF Case

ANDREW TARGUM, an individual;
ERIKA TARGUM, an individual;
ANDREW S. TARGUM, P.C., a New York corporation;
ANDREW SCOTT TARGUM, P.C., a New York corporation;
TARGUM, BRITTON & TOLUD, LLP, a New York limited liability partnership;
and IRWIN SEEMAN, an individual,

      Plaintiffs,

v.

CITRIN COOPERMAN & COMPANY, LLP, a New York limited liability partnership;
MATTHEW G. WEBER, an individual;
LORRAINE WEBER, an individual;
VINCENT CAMILERI, as Representative of
  the Estate of SALVATORE CAMILERI, an individual;
SHEILA WEBER, an individual;
and JOHN DOE NO. 1; an individual,

      Defendants.

_____/

## SECOND AMENDED COMPLAINT FOR DAMAGES

Plaintiffs **Andrew Targum**, an individual; **Erika Targum**, an individual; **Andrew S. Targum, P.C.**, a New York corporation; **Andrew Scott Targum, P.C.**, a New York corporation; and **Targum, Britton & Tolud, LLP**, a New York limited liability partnership; and **Irwin Seeman**, an individual (collectively, "Plaintiffs" or "The Clients"), pursuant to the federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961 *et seq.*) (the "RICO Act" or "RICO"), The Computer Fraud and Abuse Act (18 U.S.C. § 1030) (the "CFA Act"), and New York common law; bring the following Second Amended Complaint against defendants **Citrin Cooperman & Company, LLP**, a New York limited liability partnership; **Matthew G.**

Case No.: 12-cv-6909 (LTS) (SN)
ECF Case

**Weber**, an individual; **Lorraine Weber**, an individual; **Vincent Camileri, as Representative of the Estate of Salvatore Camileri**; an individual; **Sheila Weber**, an individual; and **John Doe No. 1**, an individual (collectively, the "Defendants"). As grounds therefor, Plaintiffs allege the following:

## PRELIMINARY STATEMENT

1.      This litigation arises from the accountant-client relationship that existed between The Clients, on the one hand; and Citrin Cooperman & Company, LLP ("CITRIN") and Matthew G. Weber ("WEBER"), on the other. Despite all standards of professionalism and legality, CITRIN and WEBER -- with the assistance, support, and complicity of the other defendants named in this action along with other unnamed and yet-unidentified accomplices -- purposefully lied to The Clients; put The Clients in grave economic, as well as legal, danger; and disregarded The Clients' interests in favor of their own interests.

2.      While The Clients reasonably thought they were dealing with reputable and honorable professionals working at a respected accounting firm, The Clients were actually the unknowing victims of a long-running fraudulent and criminal scheme perpetrated by a vicious firm which now claims to be a "total stranger" to the crimes committed with its resources and in its offices, a now-convicted felon Partner of CITRIN, and a collection of other professionals and individuals who were active participants in the scheme and subsequent cover-up.

3.      Unbeknownst to the innocent Clients at the time, CITRIN, in preparing The Clients' tax filings, grossly underreported The Clients' taxable income -- sometimes by as much as 90% -- and provided The Clients false documentation to mislead and outright defraud them. At times, CITRIN even failed to file any tax returns at all for The Clients while assuring The Clients that the returns The Clients had signed for filing and/or authorized CITRIN to file had

Case No.: 12-cv-6909 (LTS) (SN)
ECF Case

indeed been filed and that The Clients' interests were protected.  In addition, CITRIN, WEBER, and others named herein took funds provided to them by The Clients earmarked for paying The Clients' tax liabilities and converted those funds for personal use.

4.      WEBER is currently incarcerated at a New York State correctional facility, serving a sentence of three to nine years, after having pleaded guilty to several crimes including, but not limited to, stealing more than $828,000 from TARGUM in the manner described in this Second Amended Complaint.  This lawsuit is the civil counterpart to the criminal prosecution to which WEBER has already admitted his guilt.

5.      As a result of this fraud, The Clients are now facing in excess of $2,000,000 in fees and penalties being assessed by the Internal Revenue Service, the New York State Department of Taxation and Finance, the New York State Workers' Compensation Board, and the New York City Department of Finance, as well as mounting professional fees as they deal with the turmoil this has caused them -- all directly because The Clients put their faith, trust, and belief in what CITRIN and WEBER represented to them, which has turned out to be as misguided a decision as they could have made.

6.      The Clients are not the only ones who woefully misplaced their trust in CITRIN and WEBER, as several other clients of CITRIN and WEBER's -- explained in greater detail below and including, but not limited to, Jordan Bardach, Imagine Marketing Group, LLC ("the Bardach Victims"), and the children of Werner and Faith Lippe ("the Lippe Victims") (collectively, "the Other Victims of CITRIN") -- likewise had their trust abused as they also fell victim to CITRIN and WEBER's predatory acts.

7.      With each act undertaken, each misrepresentation put forth, each "red flag" ignored, and each dollar stolen over the years, it became easier and easier for CITRIN and

WEBER to continue their wrongful ways to the point that CITRIN now actually blames the victims for the harms they have suffered at CITRIN and WEBER's hands.

## PARTIES, JURISDICTION AND VENUE

### THE PARTIES

8.      Plaintiff Andrew Targum is an individual domiciled in New York, New York. At all times material hereto, Andrew Targum was a principal of Andrew S. Targum, P.C., a New York corporation; Andrew Scott Targum, P.C., a New York corporation; and Targum, Britton & Tolud, LLP ("TBTLLP"), a New York limited liability partnership.

9.      Plaintiff Erika Targum is an individual domiciled in New York, NY.  At all times material hereto, Erika Targum was the wife of Andrew Targum.

10.     Plaintiff Andrew S. Targum, P.C. is a New York corporation with its principal place of business in New York, NY.

11.     Plaintiff Andrew Scott Targum, P.C. is a New York corporation with its principal place of business in New York, NY.

12.     Plaintiff TBTLLP is a New York limited liability partnership with its principal place of business in New York, NY.

13.     Andrew Targum, Erika Targum, Andrew S. Targum, P.C., Andrew Scott Targum, P.C., and TBTLLP are hereinafter collectively referred to as "TARGUM."

14.     Plaintiff Irwin Seeman ("SEEMAN") is an individual domiciled in Wheatley Heights, New York.  SEEMAN is a non-attorney former employee of Andrew S. Targum, P.C.

15.     Defendant Citrin Cooperman & Company, LLP ("CITRIN") is a New York limited liability partnership with its principal place of business at 529 Fifth Avenue, New York, NY 10017.

16.     Defendant Matthew G. Weber ("WEBER") is an individual domiciled in the State of New York.  WEBER is currently incarcerated at the Watertown Correctional Facility in Watertown, New York, after having pleaded guilty to several crimes including, *inter alia*, stealing more than $828,000 from TARGUM and failing to file income taxes.  At all times material hereto, WEBER was a practicing certified public accountant (CPA) and a Partner at CITRIN.

17.     Defendant Lorraine Weber is an individual domiciled in Oceanside, New York. At all times material hereto, Lorraine Weber was the wife of Matthew G. Weber.

18.     Defendant Salvatore Camileri ("CAMILERI") was an individual domiciled in Oceanside, New York.  Salvatore Camileri died in October 2011.  A few months thereafter, Vincent Camileri, was appointed by the Surrogate's Court of the County of Nassau, New York, as the administrator of Salvatore Camileri's estate.  At all times material hereto, Salvatore Camileri was a CPA at an accounting firm (Stokes & Hoyt Company), was the father of Lorraine Weber, and was the father-in-law of Matthew G. Weber.

19.     Defendant Sheila Weber is an individual domiciled in Long Beach, New York. At all times material hereto, Sheila Weber was the mother of Matthew G. Weber.

20.     Defendants Lorraine Weber, CAMILERI, and Sheila Weber, as well as non-party Adam Weber are, at times herein, collectively referred to as the "Weber Family Members."

21.     Defendant John Doe No. 1 ("JOHN DOE NO. 1") is an individual over the age of 18, is *sui juris*, and is the person who prepared documents including the February 27, 2007 document identified below in Paragraph 45.  JOHN DOE NO. 1 was a co-conspirator with WEBER and CITRIN at times material to the scheme described herein.

Case No.: 12-cv-6909 (LTS) (SN)
ECF Case

22.     In addition to those persons and entities set forth as Defendants herein, there are other parties who interacted with The Clients' files at CITRIN.  As of the date of filing this pleading, The Clients know that the following CITRIN Partners, employees, and agents are among those who interacted with The Clients' files at CITRIN:

| Name | Role/Title at Citrin |
|---|---|
| WEBER | Partner |
| Michael J. Lester | Partner |
| David Kells | Chief Operating Officer |
| Gary M. Karlitz | Partner |
| Thomas Grohs | Valuation and Forensic Services |
| Elda Solla | Administrative Assistant |
| Vera Fici | Administrative Assistant |
| JOHN DOE NO. 1 | *<<unknown>>* |

23.     CITRIN's cumulative corporate knowledge must be aggregated, and notice and knowledge of a fact by a CITRIN Partner, employee, or representative must be imputed to CITRIN as a whole.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution, laws, or treatises of the United States.  This Court has supplemental jurisdiction over the New York statutory and common law claims pursuant to 28 U.S.C. § 1337.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in this district.

## GENERAL FACTUAL ALLEGATIONS

### WEBER'S PROFESSIONAL CREDENTIALS

26.     On or about August 1, 2004, WEBER, a practicing CPA, became a Partner at CITRIN.  WEBER was an Equity Partner of CITRIN, having contributed a sum totaling well over One Hundred Thousand Dollars ($100,000.00) upon admission to the partnership and which was/is held in a CITRIN account.

27.     The tortious and criminal conduct set forth in this Second Amended Complaint occurred after WEBER became a Partner at CITRIN.

### CITRIN'S PROFESSIONAL PROFILE

28.     According to its own marketing materials, CITRIN is an independent accounting, tax, and consulting firm with offices in New York, New Jersey, Connecticut, Pennsylvania, and the Cayman Islands.  With nearly 300 professionals and more than 450 total employees on its employee roster; and having grown its annual revenue from $18,000,000 to approximately $115,000,000 over the past twelve years, CITRIN ranks amongst the top 10 largest accounting firms in New York City.  As this case demonstrates, that rampant and apparently unchecked growth came at a cost -- a lack of proper institutional control which allowed this fraudulent scheme to go unchecked for years despite obvious red flags waving in front of CITRIN's management relating to the conduct of both CITRIN's Partners and staff.

29.     CITRIN offers its professional services in three core areas: (1) Attest and Assurance, (2) Tax Compliance and Research Services, and (3) Consulting and Specialty Services.

30.     CITRIN touts itself as a firm that operates under a "*team-based approach*" whose "*vision is to enhance the business value and personal lives of our clients, through our expert advice and passion in everything we do.*"   Additionally, as stated on the CITRIN web site, a major tenet of CITRIN's professional philosophy is to "*work hard to be trusted partners and understand that lasting success comes by working together.*"

31.     Among the "trusted partners" with whom WEBER worked was Gary M. Karlitz ("Karlitz") who, at all times material hereto, was a practicing accountant and a Partner at CITRIN.  Karlitz was the practice leader of the Valuation Services, Forensic Services, and Forensic Accounting Group at CITRIN and was responsible for overseeing WEBER as his direct, but not only, supervisor.

32.     Within CITRIN's Valuation and Forensic Services Group is a team of professionals, including WEBER, who tout themselves as experts in the realm of fraud investigation.  Karlitz, WEBER, and others at CITRIN claim that the firm's ability to sniff out fraud is based on their ability to "*provid[e] valuable insights obtained from hands-on experience.*"

33.     Moreover, CITRIN places a great value on its professional reputation and protecting that reputation, seeking at all times to avoid any potential embarrassment that might come to CITRIN as a result of its representatives' actions.  As this fraud has been publicly exposed, CITRIN has been revealed for what it really is: ruthless and apparently ignorant of what its Partners and employees do under the CITRIN name year after year.

### THE PROFESSIONAL RELATIONSHIP BETWEEN THE PARTIES

34.     Commencing in at least 2003, WEBER prepared and filed The Clients' city, state, and federal income taxes.

35.     In early 2005, several months after WEBER had joined CITRIN as a Partner, WEBER retained TARGUM'S law firm, TBTLLP, to represent WEBER in a civil lawsuit styled *Cederbaum v. Financial Appraisal Services, Ltd. and Matthew Weber*, New York Supreme Court, Nassau County, Index No. 04758/2005, in which WEBER was sued for accounting malpractice.

36.     WEBER's installation as a Partner at CITRIN was a confirmation of WEBER's professional skills and served as a comfort to TARGUM in representing him in the lawsuit.

37.     WEBER expressed to TARGUM that having TBTLLP represent WEBER would benefit not only his personal interests but also CITRIN's interests as well.

38.     Rather than pay TARGUM attorneys' fees for the professional services TARGUM's firm was rendering to WEBER in the *Cederbaum* matter, WEBER proposed that they trade their firms' professional services with one another: WEBER, as a Partner at CITRIN, would provide The Clients CITRIN's professional accounting services in exchange for TBTLLP's legal services -- all without them charging one another for the work being done.

39.     Though no fees were specifically paid by TARGUM for the professional services they were receiving, WEBER, on CITRIN's behalf, stated that no such payments were necessary; as both TARGUM and WEBER/CITRIN were receiving fair compensation from one another in the form of the mutual exchange of their services.

40.     SEEMAN was regularly sent invoices by CITRIN for the professional services he received.

41.     Pursuant to the agreements, understandings, and performance of TARGUM, WEBER, and CITRIN, an accountant-client relationship existed between CITRIN and The Clients.

42.     TBTLLP represented WEBER; and CITRIN provided professional services to The Clients.   WEBER's authority as a representative Partner at CITRIN to offer, and subsequently provide, CITRIN's services was never questioned, as WEBER openly and freely utilized every aspect of CITRIN's resources.  In fact, CITRIN now readily acknowledges having provided its professional services and resources to The Clients.

43.     WEBER expressly and implicitly represented to The Clients that CITRIN was conflict-free and engaged in protecting The Clients' tax and corporate interests.

44.     Moreover, WEBER's position as a Partner at CITRIN served as a justification for The Clients' agreeing to let CITRIN represent their tax interests and, over time, expand its role as their representative, to the extent circumstances required it.

45.     CITRIN and WEBER represented and advised The Clients in connection with at least the following personal and complex business matters: (a) state tax filings, (b) federal tax filings, (c) corporate formations, and (d) local business/tax filings.  Attached hereto as **Exhibits "A" - "H"** is a compilation of documents evidencing the types of professional services WEBER and others at CITRIN provided to The Clients over the years:

Case No.: 12-cv-6909 (LTS) (SN)
ECF Case

| EXHIBIT | DATE | ELECTRONIC MAIL MESSAGE | | | PROFESSIONAL SERVICE PROVIDED |
| :---: | :---: | :---: | :---: | :---: | :---: |
| | | FROM | TO | SUBJECT | |
| A | Feb. 27, 2007 | CITRIN (WEBER) | TARGUM | Maria's W-2 | Prepared federal corporate wage and tax statement |
| B | Jan. 16, 2008 | CITRIN (WEBER) | TARGUM | 05 & 06 | Prepared federal and state personal tax returns |
| C | March 10, 2009 | CITRIN (Elda Solla) | CITRIN (WEBER) | Andrew Targum / Maria D'Onofrio | Prepared state and city withholding tax return for corporation |
| | March 10, 2009 | CITRIN (WEBER) | TARGUM | | |
| D | Jan. 6, 2010 | CITRIN (Elda Solla) | CITRIN (WEBER) | <<blank>> | Prepared federal personal tax return |
| | Jan. 6, 2010 | CITRIN (WEBER) | TARGUM | | |
| E | June 1, 2010 | CITRIN (Elda Solla) | CITRIN (WEBER) | Targum | Prepared state corporate tax declaration |
| | June 1, 2010 | CITRIN (WEBER) | TARGUM | | |
| F | Oct. 8, 2010 | CITRIN (WEBER) | TARGUM | TBT Amendment | Prepared Certificate of Amendment of TARGUM corporate entity registration |
| G | July 5, 2011 | CITRIN (Elda Solla) | CITRIN (WEBER) | 2Q 2011 | Prepared state corporate employment tax return |
| | July 5, 2011 | CITRIN (WEBER) | TARGUM | | |
| H | July 26, 2011 | CITRIN (Elda Solla) | CITRIN (WEBER) | 941 | Prepared federal corporate quarterly tax return |
| | July 26, 2011 | CITRIN (WEBER) | TARGUM | | |

46.    As the above-cited exhibits above demonstrate, The Clients were engaged in an accountant-client relationship with CITRIN.  WEBER, in his capacity as a Partner at CITRIN, confirmed that representation orally, through his actions, and in writing on numerous occasions. The Clients and CITRIN maintained a continuous and wide-ranging accountant-client relationship in connection with their tax and corporate activities at all times material hereto. During that time, The Clients relied upon WEBER's advice and reputation for trustworthiness and the reputation and integrity of CITRIN as his employer.

47.    At all times during WEBER's representation of The Clients, WEBER acted with the apparent and actual authority of CITRIN.  In communications with The Clients, WEBER confirmed that he would represent The Clients in his capacity as a Partner of CITRIN.

48.    On behalf of The Clients, several CITRIN Partners and employees -- including WEBER, Michael J. Lester, David Kells, Thomas Grohs, Elda Solla, and Vera Fici -- utilized CITRIN software and the assistance of fellow Partners and employees to provide The Clients and the Other Victims of CITRIN with a full array of accounting services.  The Clients received e-mails from CITRIN which contained work product purportedly from WEBER and from CITRIN Partners and employees other than WEBER, including Vera Fici, Elda Solla, and JOHN DOE NO. 1, regarding The Clients' tax and corporate matters.  *See*, *e.g.*, **Exhibits "A" - "H"** attached.

49.    Over the years, The Clients and WEBER had meetings at CITRIN's Manhattan office, and WEBER introduced The Clients to other CITRIN Partners, identifying The Clients as clients of the firm.  The Clients also received from CITRIN mailings, newsletters, and promotional items since 2004.

50.    WEBER and CITRIN regularly, if not solely, communicated with The Clients using CITRIN letterhead, CITRIN's e-mail server, CITRIN's telephone systems, facsimile lines,

and instructed The Clients to wire funds to CITRIN-identified bank accounts.  *See*, *e.g.*, **Exhibit "I"** attached.

51.     From The Clients' perspective, they had a typical relationship with their accountants.  Everything appeared to be within the normal course of business, and The Clients had no idea at that time that WEBER and CITRIN were, and had been, altering and submitting under-reported tax returns for The Clients, failing to file necessary tax returns for The Clients, creating fraudulent documents and/or converting The Clients' funds.

**THE WIRE TRANSFERS TO CITRIN-IDENTIFIED BANK ACCOUNTS**

52.     As mentioned above, numerous wire transfers were made at WEBER's request to CITRIN-identified bank accounts bearing CITRIN's name and address.

53.     On April 5, 2005, shortly after WEBER had arrived as a Partner at CITRIN, WEBER sent TARGUM an e-mail (using his CITRIN e-mail account) instructing TARGUM to wire funds needed to pay New York State and New York City taxes to a CITRIN-identified bank account at Sterling National Bank, thusly:

> ***We have to send NYS/NYC $ for you for 1st quarter 2005 $9,500.
> We will make a wire payment like the IRS payment.***  *It's the best way.  I will let you know what to do tomorrow.*  ***Its [sic] ok to use my Citrin Cooperman a/c.  They are ok now.  I will set this up for your PC for future payments.***  *You just have to register.  Saves a lot of paperwork.*

*See* **Exhibit "J"** attached hereto (emphasis added).

54.     Upon information and belief at all relevant times, CITRIN maintained accounts at Sterling National Bank, including CITRIN's Operating Account.

55.     The account to which TARGUM was instructed to wire the funds clearly bore CITRIN's name and business address:



56.     In fact, the dozens of wire transfers that The Clients made at WEBER's behest

virtually all have the same key common characteristics:

> BNF Name:    Matt[hew] G. Weber c/o Citrin Cooperman
> BNF Address: 529 Fifth Avenue
>              New York, NY 10017

57.     The following is a copy of an actual wire transfer confirmation provided to The

Clients after they made a wire transfer in accordance with WEBER's instructions:



58.     While WEBER initially instructed TARGUM to wire funds to a CITRIN account

at Sterling National Bank, 622 Third Avenue, New York, NY 10017, a September 19, 2006 e-

mail to TARGUM from WEBER on the CITRIN e-mail server bearing WEBER's CITRIN

signature block and business card instructed TARGUM that he was to henceforth wire funds to a different CITRIN account at Signature Bank, 565 Fifth Avenue, New York, NY 10017.  *See*, **Exhibit "K"** attached.

59.     WEBER instructed The Clients, both orally and via CITRIN's electronic mail server, that the above-referenced bank accounts were CITRIN accounts utilized for clients to pay their taxes.  Based on WEBER's instructions, The Clients sent a minimum of eighty (80) bank wire transfers to CITRIN.  Attached hereto as **Exhibit "L"** is a chart stating the date, Originator, Origination Bank, Receiving Bank, Beneficiary, and Amount as to each of those wire transfers.

60.     Other victims of the fraudulent scheme identified herein were likewise given instructions on how to transact business with CITRIN as clients in the normal course of business -- instructions that were identical to those given to The Clients.  In fact, the Bardach Victims have numerous bank statements reflecting wire transfers they made to CITRIN which were intended for the payment of the Bardach Victims' tax obligations.

61.     The Clients were justifiably confident that they were transacting business with CITRIN, as clients, in the normal course of business; and that the accounts to which they had wired their funds were indeed CITRIN-identified bank accounts, bearing CITRIN's name and CITRIN's business address, with the transfer details having been given over CITRIN's e-mail.

### THE TAX FRAUD ENTERPRISE

62.     The RICO Defendants are part of an "association-in-fact" -- "the Tax Fraud Enterprise" -- that appears to conduct legitimate business but which has regularly perpetrated a scheme to defraud (the "Tax Fraud Scheme") upon The Clients, other clients/victims, and several governmental tax authorities.

## The Tax Fraud Enterprise's Management Structure

63.     The Tax Fraud Enterprise has a pyramid-like management structure with WEBER normally sitting atop that pyramid; though at important junctures, other Tax Fraud Enterprise members, including CITRIN itself, have taken the seat atop the pyramid and have taken the lead in the Enterprise's affairs.

64.     To implement WEBER's directives, he relied upon his fellow Partners and employees at CITRIN (including Vera Fici, Elda Solla, Thomas Grohs, Michael J. Lester, CPA and/or JOHN DOE NO. 1), his father-in-law (CAMILERI), and others to carry out the Tax Fraud Scheme.

65.     At times relevant to the existence of the Tax Fraud Enterprise, it was CITRIN itself which sat atop the pyramid and had its representatives undertake the acts required to further the Tax Fraud Scheme -- acts which sometimes took the form of "failures to act" in the face of patent evidence that CITRIN's resources were being used to perpetrate the Tax Fraud Scheme upon The Clients and others.  At other times, according to WEBER's own admissions, CITRIN's actions were more overt and affirmative, such as with Michael J. Lester interceding with the IRS in connection with the Bardach Victims' tax matters.  According to WEBER, both he and "Michael" (presumed to be Michael J. Lester) reviewed the Bardach Victims' tax matters, consulted with one another, and communicated with the IRS in connection therewith, even though CITRIN has claimed in the *Bardach* lawsuit -- just as it has in this lawsuit -- that it had no professional relationship with the Bardach Victims.  WEBER and Lester are just two of the CITRIN Partners and/or employees who are known and/or believed to have acted in furtherance of the Tax Fraud Enterprise.

Case No.: 12-cv-6909 (LTS) (SN)
ECF Case

66.     Additionally, at times relevant to the existence of the Tax Fraud Enterprise, CAMILERI directed the enterprise's operations by preparing false documents used by the enterprise to further the goals of the Tax Fraud Scheme and instructed other members of the enterprise as to what he (*i.e.*, CAMILERI) needed to perpetrate the enterprise's fraud.

67.     The illegitimate Tax Fraud Scheme provided the Tax Fraud Enterprise with access to hundreds of thousands of dollars for a variety of legitimate and illegitimate purposes.

### The Tax Fraud Scheme

68.     **Grossly Underreported Income.**     Although The Clients did not know it at the time, their taxable income, when it was actually being reported, was being grossly underreported to the governmental taxing authorities -- sometimes by as much as 90% -- and The Clients were provided false documentation under the CITRIN logo to mislead and outright defraud them.

69.     **Prepared Two Sets of Tax Filings.**  WEBER, in the course of his employment at CITRIN, using CITRIN's computer systems and with the assistance of other CITRIN employees as well as CAMILERI, often prepared two sets of tax filings: one that was provided to The Clients, and a very different one that was filed with the appropriate governmental taxing authority utilizing CITRIN's Employer Identification Number ("EIN").  The copy that was provided to The Clients, which showed it was prepared by WEBER as a representative of CITRIN, contained the proper factual information provided to WEBER by The Clients, which they were told was the information that had been provided to the taxing authority.  Meanwhile, the copy CITRIN actually filed with the appropriate governmental taxing authorities (if one was filed at all) grossly underreported The Clients' taxable income and contained other material factual misrepresentations of which The Clients were unaware.

70.     **Failed to File Required Tax Returns.**      As indicated above, CITRIN also routinely failed to file tax returns on behalf of The Clients when required to do so while telling The Clients that the necessary paperwork had been filed.

71.     The Clients relied on the professional work product of CITRIN and followed all professional guidance given by WEBER and others at CITRIN who provided services to The Clients.

72.     **Retention of The Clients' Documents.**      The Clients provided CITRIN the documents needed to prepare legitimate tax returns for The Clients.  To this date, those documents have not been returned to The Clients and, upon information and belief, remain in CITRIN's possession and exclusive control.

73.     **Corrupted The Clients' Computers and Data.**      Moreover, in the course of providing professional accounting services to The Clients, CITRIN and WEBER were provided access to TARGUM's computers, including but not limited to the QuickBooks applications and other electronic spreadsheets that housed the information that was supposed to be inserted into The Clients' tax return filings.  CITRIN and WEBER used this access to further their intended fraud by, *inter alia*, manipulating information in electronic format to alter filings with government agencies.  The altered electronic data on TARGUM's computers has been permanently corrupted, and The Clients have had to incur significant cost to restore the data to its condition prior to the wrongdoing.  The Clients asked CITRIN to cooperate and tell The Clients the full scope of CITRIN's and WEBER's involvement and infiltration into TARGUM's computers.  CITRIN has refused to cooperate, forcing The Clients to incur the expense of determining what documents were falsified, what computer entries were still valid, and which alterations were unauthorized and need to be corrected.

74.   **Misappropriated/Stole Client-Wired Funds.**   WEBER regularly instructed The Clients to wire funds to the CITRIN-identified bank account so that CITRIN could then disburse from its bank account the necessary amount of funds to satisfy The Clients' tax liability in connection with the tax filings.

75.   What was actually happening, though, was that CITRIN and/or WEBER took the funds provided to them by The Clients earmarked for paying The Clients' tax liabilities and converted those funds for CITRIN's and/or WEBER's own use.

76.   For example, The Tax Fraud Enterprise would prepare and provide The Clients a copy of a tax return showing that The Clients were liable for paying $20,000.00 to a taxing authority; and The Clients would then wire $20,000.00 to a CITRIN-identified bank account to satisfy the tax obligation.

77.   Rather than file a return showing that The Clients were liable for paying $20,000.00 to the taxing authority, the Tax Fraud Enterprise either would file nothing on The Clients' behalf or would file with the taxing authority a second tax return that WEBER, other people at CITRIN, or CAMILERI had prepared which showed The Clients were only liable for paying $5,000.00 to the taxing authority; and the Tax Fraud Enterprise would retain the remainder and apply it to its members' own personal uses.

78.   In a specific example of this misappropriation and misdirection by the Tax Fraud Enterprise, one of the Bardach Victims wrote and delivered to CITRIN a check in March 2008 payable to the United States Treasury in the amount of Twenty Thousand Dollars ($20,000.00). Instead of forwarding the check to the U.S. Treasury for the benefit of the Bardach Victims, the check was altered by members of the Tax Fraud Enterprise and then delivered to the U.S.

Treasury so that the payment would be processed and applied to benefit CAMILERI and satisfy certain outstanding tax obligations he had at the time.

79. The Tax Fraud Enterprise was perpetuated in near identical fashion on The Clients, on the Bardach Victims, and on other victims presently unknown.

### Communications with The Clients and Taxing Authorities

80. WEBER, as a Partner and representative of CITRIN, would regularly communicate with the taxing authorities on behalf of The Clients -- doing so in writing on CITRIN's letterhead or through CITRIN's electronic mail servers and orally using CITRIN's telephone systems. *See* **Composite Exhibit "M"** attached. In the course of those communications, WEBER represented to the taxing authorities that, in his capacity as a Partner of CITRIN, he represented The Clients in connection with their tax matters.

81. In fact, in these communications with governmental representatives, WEBER often referred to himself, CITRIN, and The Clients as a collective "we" -- embracing the team-based approach and ideal of togetherness under which CITRIN promotes itself on its website:



*See*, *e.g.*, **Exhibit "N"** attached.

82.     WEBER's communications with the governmental agencies were made with CITRIN's awareness and utilized CITRIN's corporate accounts to send the documents. Specifically, both Elda Solla and Vera Fici were aware that WEBER was preparing and sending documents on The Clients behalf for years.

83.     Additionally, WEBER was not the only Partner at CITRIN to communicate with governmental agencies in furtherance of the Tax Fraud Scheme.  Upon information and belief, a CITRIN Partner identified in e-mail communications with the Bardach Victims only as "Michael" communicated with the IRS, and prepared documents submitted to the IRS under CITRIN's name, with regard to the Bardach Victims' tax matters -- efforts for which "Michael" was compensated by either CITRIN or the Tax Fraud Enterprise.  Based on the review of limited electronic information available to The Clients, it is believed that the Partner identified as "Michael" is actually Michael J. Lester, CPA, who also interacted with TARGUM's returns.

84.     Moreover, the tax filings made on behalf of The Clients were submitted under CITRIN's EIN, the unique nine digit number assigned to CITRIN by the IRS to track and identify all filings made by CITRIN.

85.     The subject of the communications WEBER and his CITRIN colleagues had with the taxing authorities did not always necessarily match up with the information contained in the paperwork provided to The Clients -- something of which The Clients were totally unaware.

86.     At no time relevant to the allegations stated above were The Clients aware that two drastically different sets of tax filings had been prepared on their behalf, that tax returns that should have been filed for them were actually never filed, or that the funds they had wired to

CITRIN-identified bank accounts had been applied anywhere other than to satisfy their tax obligations.

### Forged Power of Attorney

87.     Moreover, The Clients were unaware that several Partners and employees of CITRIN were proffering, purportedly on behalf of The Clients, other false documents to the taxing authorities to conceal the fraudulent scheme.  For example, in August 2008, at least three individuals working at CITRIN prepared on CITRIN's behalf a false Power of Attorney that was signed by WEBER and two CITRIN employees (Thomas Grohs and Elda Solla) and which bore forged signatures purporting to be those of Andrew Targum and Erika Targum, *to wit*:

and used it to further the fraudulent scheme.  Attached hereto as **Exhibit "O"** is a copy of the August 2008 Power of Attorney complete with the Transmission Verification Report memorializing that the document was sent via facsimile from CITRIN's Manhattan office to the New York State Department of Taxation and Finance.

88.    This document allowed WEBER, as a representative of CITRIN, to further conceal the fraudulent scheme and was supported by two other CITRIN employees.  By operating under a Power of Attorney, WEBER and his CITRIN colleagues were able to file documents in Andrew Targum's and Erika Targum's names without ever revealing to Mr. and Mrs. Targum what WEBER and his CITRIN colleagues were doing, when they were doing it, with whom they were communicating, and how they were purportedly handling their affairs. Had Andrew Targum and Erika Targum been privy to these actions, they would have questioned WEBER or someone else at CITRIN who was involved in what was happening and likely would have been able to uncover the fraud -- and thus save themselves from additional harm -- much earlier than the fraudulent scheme was revealed to them.

89.     Moreover, because the signatures of Andrew Targum and Erika Targum are forged, it is impossible for Mr. Grohs or Ms. Solla -- the two CITRIN employees who "witnessed" Mr. and Mrs. Targum's signatures -- to have acknowledged, as "two disinterested individuals," the person(s) signing the document (*i.e.*, Mr. and Mrs. Targum).  This is yet another example of the collaborative effort required by the Tax Fraud Enterprise and evidence of the internal knowledge of multiple colleagues of CITRIN about what was happening at CITRIN.

### IRS-Filed Tax Returns Showed Different Address from Clients' Copies

90.     The tax returns WEBER and CITRIN routinely filed with the Internal Revenue Service falsely listed "M. Weber - Citrin Cooperman, 529 5th Avenue, 2nd Floor, New York, NY 10017" as Andrew Targum and Erika Targum's "home address," while the "copies" WEBER and CITRIN provided Mr. and Mrs. Targum -- copies which WEBER and CITRIN purported were true and correct copies of the documents that were filed with the Internal Revenue Service -- showed Mr. and Mrs. Targum's actual home address.  *See* **Exhibit "P"**

91.     Had The Clients known this was happening, they would not have engaged CITRIN as their accountants, and The Clients would have retained different accountants to provide them with tax and corporate advice.

### IRS-Filed Tax Returns Showed They Were Filed
### Under Citrin's Employer Identification Number ("EIN")

92.     In addition to the foregoing, many of the tax returns filed with the Internal Revenue Service and New York State taxing authorities showed that the documents were filed under CITRIN's EIN.

93.     Having filed the fraudulent tax returns under its EIN, CITRIN bears the responsibility for the truthfulness and accuracy of its employees' preparation of those filings.

94.     Moreover, in allowing its EIN to be used for the purpose of filing The Client's tax returns, CITRIN assumed the seat atop the Tax Fraud Enterprise's management pyramid; because without the use of that vital EIN, the Tax Fraud Scheme would have crumbled.

95.     To the extent CITRIN claims to be a "total stranger" to such filings, that claim is belied by the fact that CITRIN's "corporate consciousness" is well aware of those documents; and all such knowledge, information, and evidence housed within CITRIN's workplace -- in paper files, in electronic files, and in the minds of the humans who work at, and constitute, CITRIN -- must be imputed to CITRIN.

### CITRIN'S COMPUTER SOFTWARE AND DATABASES ARE DESIGNED TO PREVENT A FRAUD LIKE THIS

96.     WEBER informed The Clients that all documents created on behalf of The Clients were created on CITRIN computers and utilized information generated from The Clients' computer(s).  This was confirmed to The Clients on several occasions, when documents e-mailed by WEBER were originated and labeled from other employees of CITRIN.

97.      CITRIN maintains a very sophisticated computer database containing, among other files, its clients' tax returns.  To prepare the tax returns for filing each year, CITRIN inputs data into those returns.  For continuing clients, some of the data, like their names and addresses, do not change often from year to year; other data, like income and deductions, are expected to change.

98.     Each person who has access to the CITRIN computer system is given a unique identifying "user name," which he or she types on to the screen before using the computer.

99.     The computer system keeps track of exactly when each tax return is modified, and by whom.

100.    The computer system can then generate "Activity Reports" that show each date and time each tax return was modified and which user account made each of the modifications.

101.    At all relevant times, WEBER had a unique "user name" which he used to access CITIRN's computer system.  So too did all of the other CITRIN employees who prepared, or assisted in preparing, The Clients' tax returns.

102.    CITRIN's computer database contains numerous documents and electronic metadata demonstrating that WEBER and others at CITRIN prepared tax returns for The Clients, and used CITRIN's EIN in doing so, during the time period referenced above.

103.    For example, the following images captured from CITRIN's computer system show that WEBER -- or other CITRIN employees or agents under his control and/or with his authorization -- accessed the CITRIN computer database to prepare tax documents for The Clients under the presumed client identifier "WEBTARG - Targum, Andrew":





104.    Additionally, CITRIN's computer system contains electronic records showing that CITRIN Partner Michael J. Lester, CPA -- or other CITRIN employees under his control and/or with his authorization -- accessed the CITRIN computer database and reviewed documents prepared for The Clients on multiple occasions.

105.    Similarly, CITRIN's computer systems contain numerous documents and electronic metadata (*e.g.*, correspondence, electronic mail, telephone logs, facsimile confirmations, wire transfers) demonstrating that WEBER and others at CITRIN communicated either directly or indirectly with, or prepared electronic documents that were sent to, The Clients concerning CITRIN's preparation of those tax documents on behalf of The Clients, and used CITRIN's EIN in doing so.

106.    It is important to note that as a member of CITRIN's Valuation and Forensic Services Group, WEBER should not have been utilizing CITRIN's computers, or CITRIN's EIN, to prepare any tax returns.  CITRIN, though not The Clients, knew that such work was outside the realm of WEBER's expected duties and that any recordation on its internal "Activity Reports" showing that WEBER was working on tax returns -- with or without CITRIN's EIN --

should have stood out as a red flag, warning CITRIN that something was amiss. Indeed, CITRIN's computer databases were replete with evidence that WEBER was preparing tax returns using CITRIN's EIN, but CITRIN knowingly ignored that information and did nothing to stop WEBER.

107.    In operating and maintaining its computer databases and systems, CITRIN had an obligation to review the usage of CITRIN computers, CITRIN's EIN, as well as the "Activity Reports" to monitor and prevent fraud or other crimes of dishonesty from being perpetrated with its electronic systems.

108.    Failure to satisfy its obligation in this regard would allow CITRIN Partners, employees, agents, and representatives with access to the computer databases and systems the ability to engage in wrongful conduct that could fraudulently, maliciously, intentionally, recklessly, or criminally harm the rights and interests of others, including The Clients.

109.    At all times material hereto, CITRIN had a duty and the ability to supervise and control WEBER as a Partner of the firm.

110.    Similarly, JOHN DOE NO. 1 was an employee at CITRIN, and CITRIN had a duty and the ability to supervise and control JOHN DOE NO. 1.

111.    CITRIN knew or should have known that WEBER, with assistance and vital compliance by other Partners and employees at CITRIN (including JOHN DOE NO. 1), was committing the crimes and torts detailed herein; and CITRIN knew or should have realized at some point during the tenure of his fraudulent scheme that WEBER and other Partners of the firm were using firm resources (both human and non-human) and spending firm time committing such a massive and wide-spread fraud.

Case No.: 12-cv-6909 (LTS) (SN)
ECF Case

112.     Moreover, CITRIN knew or should have known that its Partners were conspiring with other CITRIN employees to defraud clients because CITRIN should have had reasonable protections in place to make sure that its employees and Partners are never in a position to help one another steal from a client.

113.     CITRIN was aware that WEBER and other CITRIN Partners and employees were utilizing CITRIN computers and EIN to review, prepare, and send false and altered documents that were fraudulently given to The Clients and governmental authorities (including through the use of a trackable CITRIN FedEx corporate account); and CITRIN recklessly ignored that information and did nothing to halt or address that practice.

114.     Several of the above-referenced mailings were sent using CITRIN's FedEx corporate account.  *See*, *e.g.*, **Exhibit "Q"** hereto.  These mailings were identified as being sent by "M. Weber, CPA," were shipped from CITRIN's Manhattan office using CITRIN's pre-printed FedEx labels, and were billed to CITRIN through CITRIN's FedEx corporate account.

115.     By the repeated use of the CITRIN FedEx corporate account to send documents on behalf of The Clients, CITRIN either knew WEBER and others at CITRIN were providing their professional services to The Clients or should have known that an inordinate amount of mailings not marked with proper client identifiers were being sent to governmental taxing authorities -- something that CITRIN either recognized and ignored or should have recognized but failed to.

116.     To the extent WEBER's and other CITRIN employees' activities stood outside the usual course of their duties for clients at the firm, several Partners and employees at CITRIN, such as Vera Fici, Elda Solla, Thomas Grohs, Michael Lester, and/or JOHN DOE NO. 1, were aware and should have questioned why they were preparing, scanning, and sending documents

without properly charging to The Clients or active CITRIN client files the time and expense of those activities.

## THE TAX FRAUD ENTERPRISE'S LEGITIMATE ACTIVITIES

117.    The Tax Fraud Enterprise also appears to have conducted legitimate business activities, using many of the same persons used in its illegal services.

118.    CITRIN -- as an accounting, tax, and consulting firm -- conducts legitimate business for many of its clients domestically and abroad.  Many of CITRIN's employees (including WEBER, Michael Lester, Gary Karlitz, Elda Solla, Thomas Grohs, and Vera Fici), in the course of their normal business day, typically provide their professional and para-professional services as one would expect the representatives of a large, seemingly reputable firm like CITRIN to do.

119.    Prior to his incarceration, WEBER spent several decades providing his professional services to a number of clients in a legitimate manner.

120.    Likewise, it is presumed that during his professional career, CAMILERI provided clients of his legitimate and lawful professional accounting services covering a variety of tax and business issues.

## THE TAX FRAUD ENTERPRISE'S PATTERN OF FRAUD

121.    As previously discussed, the Tax Fraud Enterprise's fraudulent activities span the course of several years, beginning at least as early as 2004, and continuing unabated through the current year.

122.    The enterprise's activities had the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics.

123.    The purpose of the Tax Fraud Enterprise's fraudulent activities was to enable the RICO Defendants to enrich themselves by causing their victims, such as The Clients, to provide the enterprise funds that the victims though would be forwarded to governmental tax authorities to satisfy the victim's tax obligations but which instead were converted by the RICO Defendants for their own personal or private uses.

124.    But for WEBER's criminal indictment and ultimate conviction, the Tax Fraud Scheme would have continued indefinitely.

### The Tax Fraud Enterprise Defrauds The Clients in 2004

125.    The Tax Fraud Enterprise's fraudulent activities started as early as 2004, when CITRIN welcomed WEBER as a Partner and his ongoing clients and clients of the firm, and all of the fraudulent activities followed the same or similar pattern.  Beginning in 2004, WEBER, as a Partner at CITRIN, and his CITRIN colleagues underreported The Clients' income, prepared false documents supplied to The Clients and/or filed with governmental tax authorities, and stole from The Clients funds that The Clients were instructed would be paid to governmental tax authorities to satisfy The Clients' tax obligations.

### WEBER, ON CITRIN'S BEHALF, ASSURES THE CLIENTS THAT ALL IS TAKEN CARE OF

126.    At multiple times during the tenure of the Tax Fraud Scheme, CITRIN assured The Clients that all of their accounting and tax needs were being properly taken care of by WEBER and other CITRIN-authorized agents.

127.    For example, in December 2010, TARGUM was concerned that WEBER and CITRIN were not devoting enough time and attention to TARGUM's accounting needs.

128.    On December 15, 2010, TARGUM sent an e-mail to CITRIN expressing his concerns about their professional relationship.  WEBER responded (from his CITRIN e-mail

address), apologized for the "*crazy couple of weeks*" WEBER had been enduring with a few other professional projects, and assured TARGUM that TARGUM's accounting needs would be met in a timely manner.  *See* **Exhibit "R"** attached hereto.

129.     At the time WEBER made these statements to The Clients, he knew they were false and that The Clients would rely on his assurances that their interests were being protected. These statements were made just days after CITRIN Partner Michael Lester had accessed the Targum file on CITRIN's computer system, as described above in Paragraph 104.

130.     Plaintiffs justifiably relied on the assurances WEBER made as a CITRIN Partner, and they were thereby induced to continue their relationship with CITRIN and WEBER -- not knowing that they were actually being lied to and that their money was being converted by CITRIN and WEBER for improper use.

## CITRIN WAS AWARE OF WEBER'S CRIMINAL ACTIVITY

131.     In February 2012, a lawsuit was filed against CITRIN and WEBER in the New York Supreme Court, New York County, in an action styled *Jordan Bardach and Imagine Marketing Group, LLC v. Matthew G. Weber and Citrin Cooperman & Company LLP*, Index No. 101661/2012.

132.     According to the Amended Complaint filed in the *Bardach* lawsuit, Mr. Bardach and his corporate entity were CITRIN clients whose tax and corporate matters were being handled at CITRIN and who were the victims of the same fraudulent tax filing scheme that WEBER and CITRIN have perpetrated upon The Clients.

133.     CITRIN was put on notice on or before the date on which CITRIN was served with process in the *Bardach* lawsuit that WEBER and fellow Partners of his act CITRIN had engaged in criminal acts and professional activities rising to the level of defrauding CITRIN clients in the same exact manner The Clients were defrauded.

134.     Rather than accepting blame for the wrongful and criminal acts perpetrated by its Partner and the harm caused to the victims of those acts, CITRIN swiftly filed a countersuit against Mr. Bardach and his corporate entity in which CITRIN sought to further victimize the victims.  As shown below, this appears to be CITRIN's standard operating procedure.

### CITRIN SHOULD HAVE, BUT DID NOT, SCRUTINIZE WEBER AND HIS COLLEAGUES MORE CLOSELY TO PREVENT IMPROPRIETIES AND FAILURES TO PROPERLY SUPERVISE

135.     Aside from the foregoing, CITRIN had additional reasons to keep a watchful eye over WEBER and those with whom he worked at CITRIN before the *Bardach* action was commenced.

136.     In 2005, shortly after he joined CITRIN as a Partner, WEBER informed TARGUM that he (WEBER) was under great financial distress.

137.     As CITRIN Partner Brian J. Hoffman wrote in a published article titled *Breaking the Fraud Triangle: Keys to Deterrence*: "*Employees subjected to outside financial pressures are more likely to look for illegal ways to maintain their existing lifestyle.*"

138.     During that same time period, WEBER delivered to Karlitz -- his direct supervisor in the Valuation Services, Forensic Services, and Forensic Accounting Group -- multiple checks made payable to Karlitz himself.  At a minimum, WEBER provided Karlitz the following payments:

| DATE | AMOUNT |
| --- | --- |
| May 23, 2005 | $2,500 |
| June 1, 2005 | $2,500 |
| August 17, 2006 | $6,000 |
| TOTAL | $11,000 |

all of which were issued from the CITRIN-identified bank accounts to which The Clients had been instructed to wire their funds -- Client funds which are now missing.

139.    Also around that time, TARGUM visited CITRIN's Manhattan office and met Karlitz.  WEBER introduced TARGUM to Karlitz as a client of the firm and told TARGUM that he (*i.e.*, WEBER) and Karlitz did everything together professionally and that WEBER hardly made a professional move without consulting with Karlitz or without Karlitz knowing about what WEBER was doing.

140.    Payments from WEBER to Karlitz for any reason should have created a heightened duty on CITRIN's behalf to supervise WEBER from the outset of their professional relationship together.  CITRIN's failure to investigate these payments, or CITRIN's willful blindness in the face of those payments, constituted a reckless disregard for CITRIN's obligations under these circumstances.

### CITRIN'S MASS MAILING TO CLIENTS CONCEDING THE TAX FRAUD SCHEME

141.    On or about February 28, 2012, CITRIN sent to The Clients a generic, mass mailed letter addressed to "Dear Sir or Madam" in which CITRIN conceded, in relevant part, "*it appears that [WEBER] may have failed to file certain of your tax returns and may have failed to make related payments to taxing authorities.*"  *See* **Exhibits "S" and "T"** attached hereto.

142.    By its generically-addressed nature, The Clients presume CITRIN sent similar copies of the standardized February 28, 2012 letter to many clients who, like The Clients and Bardach, had been victimized by the Tax Fraud Enterprise's misdeeds and CITRIN's failure to either stop or identify the harmful acts its employee(s) and Partner(s) had been committing.

143.    By March 2012, the scheme that had been perpetrated became apparent to The Clients.

144.    As a result of the fraud, The Clients are now facing in excess of $2,000,000 in fees and penalties being assessed by the Internal Revenue Service, the New York State

Department of Taxation and Finance, and the New York State Workers' Compensation Board, as

well as incurring mounting legal fees as they deal with the turmoil this has caused them.

### CITRIN THREATENED SEEMAN OVER ALLEGED UNPAID CLIENT RECEIVABLES

145.   Just one week after sending SEEMAN the February 28, 2012 letter -- in which

CITRIN denied that he had "*ever been a client of [Citrin]*" and denied that the "*services*

*concerning [his] taxes, tax payments, or possibly other matters*" were rendered to him by

WEBER as a CITRIN client,



David Kells, CITRIN's Chief Operating Officer, sent SEEMAN a March 9, 2012 letter

threatening to refer him to CITRIN's collections attorney and demanding payment of "*an*

*outstanding balance due to [CITRIN] of $2,500.00 for services rendered at [SEEMAN's]*

*request*," *to wit*:

Case No.: 12-cv-6909 (LTS) (SN)
ECF Case



*See* **Exhibits "T"** (February 28, 2012 letter) and **"U"** (March 9, 2012 letter) attached hereto.

146.   Not only did Mr. Kells' March 9, 2012 letter to SEEMAN specifically reference "*your account*," SEEMAN had previously been provided over two dozen invoices from CITRIN that reflect SEEMAN's "Client No." and demands for payment to CITRIN for services rendered on his behalf.  *See* **Composite Exhibit "V"** attached hereto.  In fact, exactly two months before Joel Cooperman's February 28, 2012 letter claiming SEEMAN had never been a CITRIN client, CITRIN had drafted a December 28, 2011 Credit Memorandum and applied to SEEMAN's account two client credits in the amounts of $1,262.50 and $1,237.50, respectively.  *Id*.

147.   Clearly, CITRIN's internal policies and procedures of documenting who is, and who is not, a client of the firm are critically flawed or have been compromised.  Any assertion by CITRIN that The Clients were not clients of CITRIN and that services were not provided or rendered to them as clients of CITRIN is false.

### WEBER INDICTED, CRIMINALLY CONVICTED FOR, AND PLEADED GUILTY TO GRAND LARCENY AND FAILING TO FILE INCOME TAX RETURNS

#### Indictment

148.    In June 2012, a grand jury in New York County, New York indicted WEBER on three counts of grand larceny in the second degree for violating New York State Penal Law § 155.40(1).  WEBER was also indicted by the grand jury on one count of repeatedly failing to file personal income and earnings taxes in violation of New York Tax Law § 1808(a).  The June 27, 2012 indictment is styled *The People of the State of New York against Matthew Weber*, New York Supreme Court, New York County, Case No. 03020-2012, Criminal Justice Tracking Number 65553575Z.  *See* **Exhibit "W"** attached.

149.    During the course of the grand jury proceeding, Joel Cooperman testified as to what he knew of WEBER's criminal activity including, upon information and belief, how long he knew it, to whom the crimes were reported (if anyone), and how CITRIN reacted to learning that one of its Partners had committed crimes of dishonesty that go to the heart of CITRIN's business operations.

#### Conviction

150.    In February 2013, WEBER pleaded guilty to the crimes of which he was accused. In so doing, WEBER admitted that he stole from TARGUM property in an amount exceeding Eight Hundred Twenty Eight Thousand Dollars ($828,000.00).  Similarly, WEBER admitted that he stole from Bardach property in an amount exceeding Sixty Thousand Dollars ($60,000.00). In addition, WEBER admitted that he stole from a receivership established in the names of Werner and Faith Lippe property exceeding Fifty Eight Thousand Dollars ($58,000.00).

151.    Werner Lippe is the notorious Westchester, New York "Jeweler to the Stars" who was convicted in October 2010 of savagely murdering his wife, Faith Lippe, and incinerating her

Case No.: 12-cv-6909 (LTS) (SN)
ECF Case

body in an oil drum -- thus leaving their then-teenage children without a mother while they awaited the sentencing of their father.  In March 2011, Werner Lippe was sentenced to serve a minimum of 25 years in prison for his crime.  As a result of Mr. Lippe's crime, a receivership was established for the property of Werner and Faith Lippe to provide for the health and well-being of Mr. and Mrs. Lippe's teenage children.

152.    Through court proceedings, CITRIN was appointed the Receiver for the Lippe receivership.   WEBER was one of the professionals at CITRIN who was entrusted with protecting the Lippe children's assets.  WEBER abused that trust and stole funds from the receivership created for the Lippe children.

153.    As noted above, CITRIN -- as of the date of this filing -- has not filed any civil action against WEBER or any other member of the Tax Fraud Enterprise despite having known for at least ten months of the crimes and misdeeds causing harm to Bardach, The Clients, the Lippe receivership, and others.  The only civil actions CITRIN has brought to flex its corporate muscle have been those aimed at further victimizing the victims of CITRIN's acts and omissions.

### CITRIN IS VICARIOUSLY LIABLE FOR WEBER'S AND HIS COLLEAGUES' CRIMES AND MISDEEDS

154.    CITRIN is responsible and should be held accountable for WEBER's conduct. WEBER used his position of trust, as a Partner of CITRIN, to leverage and successfully conduct and conceal all the criminal activity for several years against many firm clients.

155.    During the entirety of the Tax Fraud Enterprise's scheme to defraud and steal funds from The Clients, WEBER was a Partner of CITRIN, used his position at CITRIN to commit crimes against The Clients and others under the guise of providing them with proper accounting representation, and used CITRIN identified bank accounts to siphon funds away from The Clients and others.

156.    Likewise, CITRIN is responsible and should be held accountable for the conduct of the other CITRIN employees, such as Vera Fici, Elda Solla, Thomas Grohs, Michael J. Lester and/or JOHN DOE NO. 1, who worked with, supported, or knew about and did nothing to stop the Tax Fraud Enterprise from carrying out its criminal acts.

157.    CITRIN claims to be a "total stranger" to The Clients, the Tax Fraud Enterprise, the Tax Fraud Scheme, and all of the crimes already admitted by WEBER that have occurred under CITRIN's roof with the vital use of CITRIN's resources.  However, CITRIN is currently prosecuting a civil action against TARGUM in the New York Supreme Court, County of New York, in an action styled *Citrin Cooperman & Company LLP v. Andrew Targum, et al.*, Index No. 653051/2012, in which CITRIN has conceded in its own pleadings that: (a) it provided several valuable services to TARGUM for which CITRIN claims TARGUM has not paid, and (b) WEBER used Citrin Cooperman's tax accounting software to perpetuate the crimes of the Tax Fraud Enterprise.  It is inconceivable that CITRIN can, out of one side of its mouth, claim to have no relationship whatsoever to The Clients, the Tax Fraud Enterprise, or the Tax Fraud Scheme while, out of the other side of its mouth, (a) sue TARGUM for having purportedly failed to fulfill TARGUM's end of the CITRIN-TARGUM relationship, and (b) admit that CITRIN's tax accounting software was used as a key component of the Tax Fraud Scheme.

158.    Moreover, far too many people working at CITRIN knew about, and far too much evidence existing at CITRIN clearly demonstrates, the perpetuation of the Tax Fraud Scheme as alleged herein for CITRIN to truly be a "total stranger" to the long-standing fraud being perpetrated upon The Clients and other victims of the Tax Fraud Enterprise.  Specifically:

- •    People in CITRIN's Accounts Receivable Department knew that CITRIN was providing professional services to SEEMAN, as shown by the monthly billing statements CITRIN sent to

SEEMAN and CITRIN's deliberate decision to write-down a portion of the outstanding amount owed on CITRIN's account;

- People in CITRIN's Information Technology Department knew that CITRIN Partners and/or employees -- primarily WEBER and Elda Solla -- were communicating with, and transmitting documents to, The Clients via CITRIN's electronic mail server;

- People in CITRIN's Accounts Payable Department knew that CITRIN's FedEx account, CITRIN's facsimile lines, and CITRIN's U.S. Mail postage account were being used to transmit and receive numerous documents for victims such as The Clients who CITRIN now claims were never actually clients of the firm. Whether properly referenced with client identifiers or not, all of the FedEx, facsimile, and postage expenses incurred by CITRIN in furtherance of the Tax Fraud Scheme were recorded, presumably reviewed before being paid, and -- if indeed these expenses were incurred on behalf of folks who were not actual clients of CITRIN -- questioned by those CITRIN representatives responsible for monitoring and paying for such expenses.

- People on CITRIN's management team knew WEBER was preparing and filing -- using CITRIN's EIN, using CITRIN's computers/licensed tax software, and using the assistance of other CITRIN Partners and support staff -- tax returns for as many as 150 individuals and business entities (a number cited by CITRIN in its civil suit against TARGUM), even though: (a) those individuals and business entities were purportedly not clients of CITRIN, and (b) WEBER's job duties did not call for him to prepare any tax returns at all.  The time spent on this effort was evident to CITRIN management by the Activity Reports which record the usage of CITRIN's proprietary software and computer systems.  Likewise, this activity was evident in its glaring omission from WEBER's billable time records.  CITRIN reviews both the billable time records and the Activity Reports (among other items), as a matter of course, to ensure its Partners and employees are being productive, are properly contributing to CITRIN's profitability, and are not committing any violations that would give rise to a claim under CITRIN's Errors and Omissions policy(ies) of insurance.

- People on CITRIN's management team were seemingly complicit in the activities of the Tax Fraud Enterprise.  As noted above, WEBER made several payments to Karlitz, his direct supervisor, out of the CITRIN-identified bank accounts from which The Clients' money was misappropriated.  To the extent Karlitz either participated in, or purposely turned a blind eye to, the Tax Fraud

> Enterprise's activities based, in part, on those payments; CITRIN
> was certainly no "stranger" to the Tax Fraud Scheme.  To the
> extent there was nothing untoward about the payments made by
> WEBER to Karlitz, other members of CITRIN's management team
> should have been, and likely were, informed of the payments,
> which they should have investigated -- a failure of which would
> have been reckless.

159.    To the extent CITRIN's management team truly was oblivious to the mountain of evidence and personal knowledge existing in its own offices -- and all actions undertaken by the Tax Fraud Enterprise were done without CITRIN's express, implied, or apparent authority -- CITRIN clearly affirmed and ratified those actions, whether explicitly or by implication, each year the Tax Fraud Enterprise was permitted to use CITRIN's human and non-human resources in the manner described herein without halting that activity.  As stated above, when upwards of 150 tax returns (whether false or legitimate) were prepared year-after-year by CITRIN Partners and employees using CITRIN's computers/licensed tax software, and CITRIN never did anything to stop that activity or disclaim responsibility for any documents filed with governmental tax agencies under its EIN, CITRIN ratified all such activity and must be held liable for doing so.

160.    It may seem surprising that CITRIN has sat idly by while one of its Partners used CITRIN-identified bank accounts to steal hundreds of thousands of dollars from client funds over a period of several years, but it is nothing less than stunning that CITRIN now asserts that it has no responsibility for its Partner's and employees' actions under these circumstances and has the temerity to sue the victims of that fraud; without having the professionalism to mention with more than a passing whisper in those public filings that its former Partner has been criminally convicted based largely on the testimony of Bardach and TARGUM.  In fact, upon information and belief, it was not CITRIN who first reported WEBER's criminal conduct; rather, it was

Bardach who discovered and reported him to the authorities.  The Bardach Victims have filed their own civil suit, separate and apart from The Clients.

161.    The Clients bring this action to hold CITRIN, WEBER, and the additional defendants liable for abusing their positions of trust, misappropriating for their own use The Clients' funds, and for putting The Clients in the financially devastated position in which they now find themselves.

162.    The Clients have duly performed all of their duties and obligations, and any conditions precedent to The Clients bringing this action have occurred, have been performed, or else have been excused or waived.

163.    To enforce their rights, The Clients have retained undersigned counsel and are obligated to pay counsel a reasonable fee for its services, for which Defendants are liable as a result of their bad faith and otherwise.

## COUNT I – BREACH OF FIDUCIARY DUTIES
### [AGAINST CITRIN AND WEBER]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 163 above, and further allege:

164.    Pursuant to the agreement(s) and understandings identified in detail above, an accountant-client relationship existed between CITRIN/WEBER and The Clients.

165.    The commercial relationship between The Clients and both CITRIN and WEBER constituted a relationship in which deep trust, dependence, confidence, counsel and reliance was placed in and existed with CITRIN and WEBER by The Clients, such that a fiduciary relationship was established.  Developing this fiduciary relationship is consistent with the relationship typically developed between a client and an accountant/tax preparer.

166.    CITRIN and WEBER were aware of The Clients' reliance, dependency upon, and trust in CITRIN and WEBER.

167.    CITRIN and WEBER breached their fiduciary duty to The Clients by concealing material information about the manner in which CITRIN and WEBER handled The Clients' tax and corporate matters, including:

    (a)    Grossly underreporting The Clients' taxable income -- sometimes by as much as 90% -- in documents CITRIN and WEBER prepared and filed for The Clients with governmental tax authorities under CITRIN's EIN;

    (b)    Providing The Clients false documentation to mislead and outright defraud them;

    (c)    Failing to file any tax returns at all for The Clients while assuring The Clients that the returns The Clients had signed for filing and/or authorized CITRIN to file had indeed been filed and that The Clients' interests were protected; and

    (d)    Taking funds provided to CITRIN and WEBER by The Clients earmarked for paying The Clients' tax liabilities and converting those funds for personal use.

168.    As a result of the foregoing breaches of fiduciary duty committed against The Clients by CITRIN and WEBER -- actions which were a substantial factor in causing The Clients an identifiable loss -- The Clients have suffered actual and special damages.

169.    The Clients seek an award of damages, including punitive damages, against CITRIN and WEBER based on CITRIN and WEBER's willful and malicious conduct against The Clients, orchestrated for a period of approximately seven years.  This course of conduct comprised not just a single instance of willful and malicious conduct, but as stated above, constituted an ongoing and systematic pattern of acts, any one of which would independently support an award of punitive damages and the cumulative effect of which demonstrates egregious and outrageous behavior.

WHEREFORE, Plaintiffs demand entry of a judgment against defendants CITRIN COOPERMAN & COMPANY, LLP, a New York limited liability partnership; and MATTHEW

G. WEBER, an individual; jointly and severally, for an amount to be determined at trial, including an award of interest, costs, and such other relief as this Court deems just and appropriate.  Plaintiffs reserve the right to seek leave of court to assess punitive damages against CITRIN and WEBER, jointly and severally.

## COUNT II – PROFESSIONAL NEGLIGENCE
### [AGAINST CITRIN AND WEBER]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 163 above, and further allege:

170.    The Clients retained CITRIN and WEBER to perform professional tax accounting services related to The Clients' tax liabilities to various governmental authorities and render corporate assistance in connection with those tax accounting services.

171.    All of the acts and omissions performed by WEBER were done within the scope of his employment as a Partner of, and CPA at, CITRIN.

172.    CITRIN and WEBER collectively owed a duty to The Clients to provide them sound, reliable advice and to refrain from making to them any false representations of fact in the course of handling their tax filings.

173.    Moreover, as the tax accountants for The Clients, CITRIN and WEBER owed a duty of due diligence to these clients.  This duty required CITRIN and WEBER, prior to signing tax returns, to investigate any "red flags" and either: (i) determine that they were innocuous, or (ii) resolve the issue presented.  CITRIN and WEBER were also required to promptly correct any known errors in the immediate or prior returns.

174.    As explained in greater detail above, CITRIN and WEBER breached the duties they owed to The Clients.

175.    As a direct and proximate result of CITRIN and WEBER's breach of duty, The Clients have suffered damage.

WHEREFORE, Plaintiffs demand entry of a judgment against defendants CITRIN COOPERMAN & COMPANY, LLP, a New York limited liability partnership; and MATTHEW G. WEBER, an individual; jointly and severally, for an amount to be determined at trial, including an award of interest, costs, and such other relief as this Court deems just and appropriate.  Plaintiffs reserve the right to seek leave of court to assess punitive damages against CITRIN and WEBER, jointly and severally.

## COUNT III – VIOLATION OF 18 U.S.C. § 1030
## ("COMPUTER FRAUD AND ABUSE ACT")
### [AGAINST CITRIN AND WEBER]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 163 above, and further allege:

176.    This cause of action asserts a claim against CITRIN and WEBER for violations of 18 U.S.C. § 1030(a)(2)(C) and 1030(a)(4) ("The Computer Fraud and Abuse Act") for exceeding authorized access to a protected computer to obtain information, for knowingly doing so with an intent to defraud, and for furthering fraudulent activity thereby to obtain something of value.

177.    CITRIN and WEBER, without authorization or by exceeding authorization conditionally granted to them, accessed, knowingly and with intent to defraud The Clients, a protected computer.

178.    In the course of preparing The Clients' tax returns, CITRIN and WEBER had access to TARGUM's computers, including but not limited to the QuickBooks applications and other electronic spreadsheets that housed the information that was supposed to be inserted into the tax return filings.

179.    TARGUM's computer and the computers that CITRIN and WEBER accessed are "protected computer(s)" as defined in 18 U.S.C. § 1030(e)(2)(B) because they are used in interstate or foreign commerce or communication, including sending and receiving electronic

mail, accessing and interacting with the internet, electronically filing documents with state and federal courts, and housing information needed for preparing federal and state income tax returns which are electronically filed with the IRS and/or tax authorities of various states by using the computer or computers.

180. While CITRIN and WEBER were able to obtain information by intentionally accessing TARGUM's protected computers, they exceeded their authorized access by altering information on TARGUM's computers, software utilized by TARGUM, and work-product created by TARGUM that CITRIN and WEBER were not entitled to alter.

181. Likewise, CITRIN and WEBER intentionally furthered a fraud by knowingly exceeding their authorized access to TARGUM's protected computers.

182. CITRIN and WEBER used this unlawful access to further their intended fraud by, *inter alia*, using and manipulating information in electronic format to alter filings with government agencies. The altered electronic data has been permanently corrupted, and The Clients have had to incur significant cost to restore the data to its condition prior to CITRIN and WEBER's wrongdoing.

183. As a consequence of CITRIN and WEBER exceeding their authority to TARGUM's protected computers, The Clients have suffered damage far in excess of $5,000.00.

184. The Clients asked CITRIN to cooperate and tell The Clients the full scope of CITRIN's and WEBER's involvement. CITRIN has refused to cooperate, forcing The Clients to incur the expense of determining what documents were falsified, what computer entries were still valid and correcting unauthorized alterations. This detection and restoration of The Clients' computerized information has been extremely disruptive to both The Clients' personal lives as

well as their business lives.  The Clients intend to learn in discovery which additional culpable

parties and causes of actions exist.

WHEREFORE, Plaintiffs demand entry of a judgment against defendants CITRIN

COOPERMAN & COMPANY, LLP, a New York limited liability partnership; and MATTHEW

G. WEBER, an individual; jointly and severally, for an amount to be determined at trial,

including an award of interest, costs, and such other relief as this Court deems just and

appropriate.

### COUNT IV – VIOLATION OF CIVIL RICO ACT (18 U.S.C. § 1962(c))
### [AGAINST CITRIN, WEBER, CAMILERI, AND JOHN DOE NO. 1]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 163 above, and further allege:

185.    This cause of action asserts a claim against CITRIN, WEBER, CAMILERI, and

JOHN DOE NO. 1 for violations of 18 U.S.C. § 1962(c) for conducting the affairs of an

unlawful enterprise (the "Tax Fraud Enterprise") through the pattern of racketeering activity

described herein.

186.    CITRIN, WEBER, CAMILERI, and JOHN DOE NO. 1 were each: (a) persons,

(b) employed by or associated with an enterprise -- the Tax Fraud Enterprise, (c) that engaged in

or affected interstate commerce, (d) who operated or managed the Tax Fraud Enterprise, (e)

through a pattern, (f) of racketeering, (g) which injured The Clients' business or property in

violation of 18 U.S.C. § 1962(c).

### THE RICO DEFENDANTS ARE "PERSONS" WITHIN THE MEANING OF THE RICO ACT

187.    At times material hereto, CITRIN, WEBER, CAMILERI, and JOHN DOE NO. 1

were each a "person" as that term is defined in 18 U.S.C. § 1961(3), and each had an active and

material role in controlling, managing, or operating the Tax Fraud Enterprise.  Moreover, while

CITRIN, WEBER, CAMILERI, and JOHN DOE NO. 1 participated in the Tax Fraud Enterprise, they each had an existence separate and distinct from the enterprise.

188.   At all times material hereto, The Clients were also each a "person" as that term is defined in 18 U.S.C. § 1961(3).

### THE RICO DEFENDANTS ARE EMPLOYED BY OR ASSOCIATED WITH AN ENTERPRISE -- THE TAX FRAUD ENTERPRISE -- WHICH CONDUCTS LEGITIMATE AND ILLEGITIMATE BUSINESS

189.   Section 1961(4) of the RICO Act defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

190.   The Tax Fraud Enterprise is an "association-in-fact," within the meaning of 18 U.S.C. § 1961(4), and constitutes a group of "persons" associated together for the common purpose of employing the multiple deceptive, abusive, and fraudulent acts described herein.

191.   The Tax Fraud Enterprise's purpose was to enrich the RICO Defendants through the enterprise's legitimate business activities as well as its fraudulent tax activities which were perpetrated upon The Clients, other clients/victims, and several governmental taxing authorities.

192.   Further, the Tax Fraud Enterprise is separate and distinct from the "pattern of racketeering activity" in which CITRIN, WEBER, CAMILERI, and JOHN DOE NO. 1 have engaged.

### THE TAX FRAUD ENTERPRISE'S ACTIVITIES AFFECT INTERSTATE COMMERCE

193.   The Tax Fraud Enterprise was an ongoing enterprise that engaged in, and whose activities affected, interstate commerce by, among other things, affecting taxes collected by several governmental taxing authorities in several states throughout the United States.

### THE RICO DEFENDANTS OPERATED AND/OR MANAGED THE TAX FRAUD ENTERPRISE

194.    At times material hereto, CITRIN, WEBER, CAMILERI, and JOHN DOE NO. 1 were associated with, operated and/or controlled the Tax Fraud Enterprise; and CITRIN, WEBER, CAMILERI, and JOHN DOE NO. 1 participated in the operation and management of the affairs of the Tax Fraud Enterprise through a variety of actions.  The roles played by CITRIN, WEBER, CAMILERI, and JOHN DOE NO. 1 are specifically set forth above, were necessary for the successful operation of their scheme, and are incorporated in this paragraph.

195.    To the extent certain members of the Tax Fraud Enterprise were not "upper management" but were merely lower-rung participants in the enterprise acting at the direction of upper management, their participation was no less important to the success of the enterprise.

### THE TAX FRAUD ENTERPRISE'S TAX FRAUD ACTIVITIES FORM A PATTERN

196.    As set forth herein, CITRIN, WEBER, CAMILERI, and JOHN DOE NO. 1, and others presently unknown have engaged in a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5), by committing or conspiring to commit at least two acts of racketeering activity, described above, within the past ten years.

197.    CITRIN, WEBER, CAMILERI, and JOHN DOE NO. 1, and others presently unknown have engaged in a scheme to defraud consumers, including The Clients, Bardach, and others, through fraudulent misrepresentations, knowing concealments, suppressions and omissions of material fact for the purpose of executing their scheme.

198.    CITRIN, WEBER, CAMILERI, and JOHN DOE NO. 1's racketeering activities amount to a common course of conduct intended to deceive and harm customers such as The Clients.  Each such racketeering activity is related, has a similar purpose, involves the same or similar participants, and has similar results affecting similar victims, including The Clients.

### THE RACKETEERING ACTIVITY ENGAGED IN BY THE TAX FRAUD ENTERPRISE

199.    The Clients were proximately damaged by the Tax Fraud Enterprise's pattern of racketeering activity directly connected with the Tax Fraud Scheme.

200.    CITRIN, WEBER, CAMILERI, and JOHN DOE NO. 1, collectively with one another as well as with others presently unknown -- some of whom are employees of CITRIN -- using CITRIN's computer systems, prepared two sets of tax filings: one that was provided to The Clients, and a very different one that was filed with the appropriate governmental taxing authority under CITRIN's EIN.  The copy that was provided to The Clients contained the proper factual information provided to CITRIN and WEBER by The Clients, which The Clients were told was the information that had been provided to the taxing authority.  Meanwhile, the copy actually filed with the appropriate governmental taxing authorities under CITRIN's EIN (if anything was filed at all) grossly underreported The Clients' taxable income.

201.    CITRIN, WEBER, CAMILERI, and JOHN DOE NO. 1 communicated with one another in varying degrees to coordinate their activities, to ensure continued adherence to the joint strategy and goal of the Tax Fraud Enterprise, and to enable the enterprise to respond as new threats to the enterprise's survival arose.

202.    The overarching purpose of the Tax Fraud Enterprise was for each of its members to profit from the funds wired by The Clients to CITRIN that had been earmarked for payment to the appropriate taxing authorities.  Upon information and belief, CITRIN, WEBER, CAMILERI and others presently unknown (such as JOHN DOE NO. 1) themselves accomplished this goal by converting the funds supplied by The Clients and misappropriating those funds for personal use as described above.

## THE RICO TAX FRAUD PREDICATE ACTS

203.    Section 1961(1) of RICO provides that "racketeering activity" is, among other things:

    (a)    Any act indictable under any of the provisions of 18 U.S.C. § 1341 (mail fraud);

    (b)    Any act indictable under any of the provisions of 18 U.S.C. § 1343 (wire fraud); and

    (c)    Any act indictable under any of the provisions of 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity).

204.    As set forth below and throughout this Second Amended Complaint, CITRIN, WEBER, CAMILERI, JOHN DOE NO. 1, and others presently unknown have engaged in the affairs of the Tax Fraud Enterprise through multiple acts which serve as the predicate for The Clients' RICO claim.

205.    To be clear, these allegations are not mere speculation on the part of The Clients. WEBER has already pleaded guilty in a New York State criminal court proceeding, and has recently begun serving a lengthy jail sentence, for his participation in the Tax Fraud Enterprise's commission of the very crimes and misdeeds alleged in this Second Amended Complaint.

### Mail Fraud

206.    CITRIN, WEBER, CAMILERI, JOHN DOE NO. 1, and others presently unknown, in violation of 18 U.S.C. § 1341, placed in post offices or official depositories of the United States Postal Service matter and things to be delivered by Postal Service, caused matters and things to be delivered by commercial interstate carrier, and received matters and things from the Postal Service or commercial interstate carriers, including but not limited to: (a) false tax returns prepared by CITRIN, WEBER, and CAMILERI and sent to governmental taxing authorities under CITRIN's EIN, (b) tax returns provided to The Clients which were materially

different from the tax returns actually filed with governmental tax authorities, (c) tax returns provided to The Clients which were never actually filed with governmental tax authorities despite CITRIN and WEBER's statements to the contrary, and (d) correspondence from CITRIN, on CITRIN letterhead, to various governmental taxing authorities in which false statements of fact were made and which permitted the Tax Fraud Scheme to persist and grow.

207.    Included among the false and misrepresentative documents sent via U.S. Mail, and those which permitted the Tax Fraud Scheme to persist and grow, are the following:

> ➢ Andrew and Erika Targum's 2005 IRS Form 1040, showing that it was prepared by "Citrin Cooperman & Company, LLP";

> ➢ June 21, 2009 letter from CITRIN, on CITRIN letterhead, to the Internal Revenue Service, discussing tax notice sent regarding TARGUM;

> ➢ November 2, 2010 letter from CITRIN, on CITRIN letterhead, to the Internal Revenue Service, discussing meeting and telephone calls conducted on TARGUM's behalf;

> ➢ January 20, 2011 letter from CITRIN, on CITRIN letterhead, to the Internal Revenue Service, enclosing 2007 and 2008 joint income tax returns for TARGUM and requesting all future communications relating to those filings be directed to WEBER at CITRIN;

> ➢ January 21, 2011 letter from CITRIN, on CITRIN letterhead, to the Internal Revenue Service, enclosing 2009 joint income tax return for TARGUM and requesting all future communications relating to that filing be directed to WEBER at CITRIN;

> ➢ March 1, 2011 letter from CITRIN, on CITRIN letterhead, to the Internal Revenue Service, discussing overpayment notice and referring to TARGUM as "my client";

> ➢ May 16, 2011 letter from CITRIN, on CITRIN letterhead, to the New York State Workers Compensation Board - Bureau of Compliance, enclosing forms prepared on TARGUM's behalf and requesting abatement of monetary penalty assessed to TARGUM; and

> ➢ December 19, 2011 letter from CITRIN, on CITRIN letterhead, to the New York State Department of Taxation and Finance, enclosing forms

prepared for TARGUM and requesting abatement of enforcement action against TARGUM.

208.    CITRIN, WEBER, CAMILERI, and JOHN DOE NO. 1's misrepresentations and acts were knowing and intentional and were made with the intent to create and manage the Tax Fraud Enterprise's scheme to defraud and manipulate The Clients and misappropriate or manipulate the funds supplied by The Clients that had been earmarked for payment of their presumed tax liabilities.

209.    Additionally, in violation of 18 U.S.C. § 1341, CITRIN, WEBER, CAMILERI and JOHN DOE NO. 1 conducted exchanges, payments, and monetary transfers using the U.S. Mail concerning the receipt and distribution of the proceeds of CITRIN and WEBER's improper conversion of The Clients' funds including, but not limited to, application of The Clients' funds to satisfy CAMILERI's own tax obligations.

### Wire Fraud

210.    CITRIN, WEBER, CAMILERI, JOHN DOE NO. 1, and others presently unknown, in violation of 18 U.S.C. § 1343, transmitted and received by wire, internet connection, or other electronic media, matters and things relating to their deceptive campaign, including false tax returns prepared by CITRIN, WEBER, and CAMILERI, electronic mail messages, and funds from The Clients that were supposed to be directed for payment of their presumed tax liabilities.

211.    Included among the false and misrepresentative documents sent or received via wire or electronic means, and those that helped foster the Tax Fraud Enterprise's deceptive campaign, are the following:

> ➢ The 80 wire transfers received by CITRIN from The Clients which are delineated in Exhibit "L" hereto.

- ➢ February 27, 2007 e-mail from CITRIN to TARGUM, showing that WEBER and JOHN DOE NO. 1, an assistant of his at CITRIN, prepared TARGUM's W-2 form;

- ➢ August 11, 2008 falsified Power of Attorney, which was prepared by CITRIN and then transferred by CITRIN via wire transmission (using CITRIN's facsimile lines) to the New York State Department of Taxation and Finance;

- ➢ February 9, 2009 e-mail from TARGUM to CITRIN, requesting preparation of Form 1099 tax filings;

- ➢ June 24, 2009 e-mail from TARGUM to CITRIN, requesting preparation of Form K-1 tax filings;

- ➢ June 1, 2010 e-mail exchange between WEBER, CITRIN, and Elda Solla, again evidencing knowledge and complicity of CITRIN and its employees; and

- ➢ False tax returns prepared by CITRIN, WEBER, and CAMILERI and filed under CITRIN's EIN.

212.   CITRIN, WEBER, and CAMILERI's misrepresentations and acts were knowing, intentional, and were made with the intent to create and manage the Tax Fraud Enterprise's scheme to defraud and manipulate The Clients by accepting funds intended for payment of presumed tax liabilities and misappropriating or manipulating those funds.

213.   Additionally, in violation of 18 U.S.C. § 1343, CITRIN, WEBER, CAMILERI and others presently unknown conducted exchanges, payments, and monetary transfers using the wires concerning the receipt and distribution of the proceeds of CITRIN and WEBER's improper conversion of The Clients' funds including, but not limited to, application of The Clients' funds to satisfy CAMILERI's own tax obligations.

### **Monetary Transactions in Property Derived from Specified Unlawful Activity**

214.   CITRIN, WEBER, CAMILERI, JOHN DOE NO. 1, and others presently unknown, in violation of 18 U.S.C. § 1957:

    (a)   knowingly engaged in monetary transactions in criminally

derived property of a value greater than $10,000 which was derived from specified unlawful activity; and

(b)      were engaged in the withdrawal, transfer or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument by, through, or to a financial institution.

215.      Specifically, CITRIN, WEBER, CAMILERI, JOHN DOE NO. 1, and others presently unknown knowingly accepted and exchanged funds from The Clients that was supposed to be directed for payment of their presumed tax liabilities using either the U.S. Postal Service or wire transfers, or both.  For example, WEBER and CAMILERI misappropriated some of The Clients' funds to satisfy CAMILERI's own tax obligations.

## Reserved Predicate Acts

216.      Plaintiffs incorporate by reference all predicate acts referenced elsewhere in this Second Amended Complaint or any exhibits or documents referenced or available as a matter of public record.  Plaintiffs further reserve the right to supplement the list of predicate acts identified through discovery in this matter.

## THE TAX FRAUD ENTERPRISE'S PATTERN OF RACKETEERING ACTIVITY INJURED THE CLIENTS

217.      Plaintiffs' injuries were directly and proximately caused by CITRIN, WEBER, CAMILERI, and JOHN DOE NO. 1's racketeering activity.

218.      The Clients have standing to sue CITRIN, WEBER, CAMILERI and JOHN DOE NO. 1 under 18 U.S.C. § 1964(c) and to recover compensatory damages, treble damages, and the costs of this suit, including an award of reasonable attorneys' fees.

WHEREFORE, Plaintiffs demand entry of a judgment against defendants CITRIN COOPERMAN & COMPANY, LLP, a New York limited liability partnership; MATTHEW G. WEBER, an individual; VINCENT CAMILERI, as Representative of the Estate of

SALVATORE CAMILERI, an individual; and JOHN DOE NO. 1, an individual, jointly and severally for an amount to be determined at trial, including an award of interest, costs, attorneys' fees, and such other relief as this Court deems just and appropriate.  Plaintiffs reserve the right to seek leave of court to assess punitive damages against CITRIN, WEBER, CAMILERI and JOHN DOE NO. 1, jointly and severally.

## COUNT V – VIOLATION OF CIVIL RICO (18 U.S.C. § 1962(d))
### [AGAINST CITRIN, WEBER, CAMILERI, JOHN DOE NO. 1, LORRAINE WEBER, AND SHEILA WEBER]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 163 and Paragraphs 185 - 218 above, and further allege:

219.     This cause of action asserts a claim against Defendants for violations of 18 U.S.C. § 1962(d) for conspiring to violate the other provisions of the RICO Act.

220.     Defendants conspired with one another, as well as other individuals and entities, to perpetrate upon Plaintiffs unlawful acts which violated the RICO Act or to perpetrate a lawful act by unlawful means, *to wit*: they made multiple misrepresentations of fact to The Clients in an effort to extract from The Clients funds intended for payment of The Clients' presumed tax liabilities, and they either committed or knowingly ignored the crimes and misdeeds of their fellow conspirators -- all of which put Defendants' own pecuniary interest ahead of The Clients' welfare and economic safety.

221.     When, during the tenure of the conspiracy, evidence arose that something about the professional services supposedly being provided by CITRIN and WEBER was amiss, Defendants would engage in a "cover up" to allow the scheme to continue.  Those efforts to "cover up" the evidence of the conspiracy are still taking place today.

222.   For example, when TARGUM became wary of the substandard level of service TARGUM was receiving from CITRIN and WEBER, WEBER, as an agent of CITRIN, assured TARGUM that all was fine and that the requested remedy was on the way.  *See*, Exhibit "R" hereto.

223.   Likewise, JOHN DOE NO. 1 would field telephone calls and e-mail messages from The Clients and would provide them false information to "cover up" for CITRIN and WEBER.  For example, on multiple occasions on which TARGUM called WEBER on his CITRIN office phone number and reached WEBER's voicemail, TARGUM was redirected to one of WEBER's fellow CITRIN employees, who represented to TARGUM that WEBER was purportedly out of the office working in another CITRIN office on that day.

224.   Additionally, Lorraine Weber knowingly accepted from her husband (WEBER) funds that were illegally obtained from The Clients, and she remained purposefully silent in the face of the fraudulent activity.  For example, Lorraine Weber purposefully failed to file resident income tax returns with the New York State Department of Taxation and Finance so she did not have to reveal her knowledge and enjoyment of monies stolen by WEBER in 2008 aggregating $152,000, in 2009 aggregating $174,700, and in 2010 aggregating $238,700.  Lorraine Weber committed this unlawful act as a means of covering up her participation in the theft of TARGUM's funds.

225.   When she did file income tax returns, Lorraine Weber knowingly underreported her family's taxable income to conceal her enjoyment of the stolen funds.  Any denial by Lorraine Weber that she knew her household income was being underreported to the appropriate taxing authorities is belied by the fact that she received multiple notices from the government alerting her of the government's awareness that she and WEBER had underreported their

income, including: (1) Internal Revenue Service - Federal Tax Lien No. FT135904 in the amount of $76,976 (Dated: January 2, 2009); and (2) New York State Tax Commission - Warrant ID No. E-117290603-W001-3 in the amount of $41,890.62 (August 15, 2012).

226.    In fact, in the summer of 2011, Lorraine Weber spoke with TARGUM and, in the course of that conversation, questioned WEBER's business judgment.  Though not understood at the time, it is now believed that Lorraine Weber's comment was a direct reference to the Tax Fraud Enterprise and her tax liens.

227.    Similarly, members of WEBER and Lorraine Weber's family -- including CAMILERI and Sheila Weber -- accepted from WEBER and Lorraine Weber funds that they knew were illegally obtained from The Clients, and those family members likewise remained purposefully silent in the face of fraudulent activity.  Participation from the Weber Family Members is vital to the success of the conspiracy.  Though merely lower-rung participants acting at the direction and request of members of the Tax Fraud Enterprise, the Weber Family Members' consent to knowingly launder the money and, including through the present day, not return the money inures to the benefit of all Defendants as well as other members of the Weber family, including WEBER and Lorraine Weber's children.

228.    In furtherance of their conspiracy, Defendants made to The Clients, or agreed to have someone make on their behalf, the false statements of fact detailed above.

229.    Through and including the date of this filing, CITRIN continues -- despite ample evidence to the contrary -- to conceal and suppress the truth about the Tax Fraud Scheme and its culpability for that scheme while marshaling a counterattack upon TARGUM and the Other Victims of CITRIN to destroy those victims' reputations.  CITRIN and its co-conspirators jointly benefit from this effort because the agreement between them includes an objective of keeping the

Tax Fraud Scheme hidden so they can all keep their share of the funds misappropriated and/or stolen from The Clients and the Other Victims of CITRIN.

230.    Defendants agreed both to the overall objective of the conspiracy and to commit at least two predicate acts in furtherance of the conspiracy.

231.    As described above, Defendants objectively manifested, through words or actions, their agreement to participate in the conduct of the affairs of the Tax Fraud Enterprise through a pattern of racketeering activity.

232.    As a direct and proximate result of Defendants' conspiracy, The Clients have suffered damage.

WHEREFORE, Plaintiffs demand entry of a judgment against defendants CITRIN COOPERMAN & COMPANY, LLP, a New York limited liability partnership; MATTHEW G. WEBER, an individual; VINCENT CAMILERI, as Representative of the Estate of SALVATORE CAMILERI, an individual; JOHN DOE NO. 1, an individual; and LORRAINE WEBER, an individual, jointly and severally, for an amount to be determined at trial, including an award of interest, costs, attorneys' fees, and such other relief as this Court deems just and appropriate.  Plaintiffs reserve the right to seek leave of court to assess punitive damages against Defendants, jointly and severally.

## COUNT VI – COMMON LAW FRAUD
### [AGAINST CITRIN AND WEBER]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 163 above, and further allege:

233.    CITRIN and WEBER, by acts of both omission and commission, made false statements to The Clients concerning material facts about their tax returns, their tax liabilities, and the use of the funds The Clients wired to CITRIN and WEBER to pay for their anticipated tax liabilities.

234.    CITRIN and WEBER knew at the time the statements were made that the statements were false.

235.    CITRIN and WEBER intended that The Clients would be induced into action by relying upon the statements of fact made to them by CITRIN and WEBER.

236.    In the course of entrusting CITRIN and WEBER to properly handle their tax matters, The Clients reasonably and justifiably relied on the statements of fact made to them by CITRIN and WEBER.

237.    As a direct and proximate result of The Clients' reliance on the statements made to them by CITRIN and WEBER, The Clients have suffered damage.

WHEREFORE, Plaintiffs demand entry of a judgment against defendants CITRIN COOPERMAN & COMPANY, LLP, a New York limited liability partnership; and MATTHEW G. WEBER, an individual; jointly and severally, for an amount to be determined at trial, including an award of interest, costs, and such other relief as this Court deems just and appropriate.  Plaintiffs reserve the right to seek leave of court to assess punitive damages against CITRIN and WEBER, jointly and severally.

### COUNT VII – CIVIL CONSPIRACY
### [AGAINST CITRIN, WEBER, CAMILERI, JOHN DOE NO. 1, LORRAINE WEBER, AND SHEILA WEBER]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 163 above, and further allege:

238.    Defendants conspired with one another to perpetrate an unlawful act upon The Clients or to perpetrate a lawful act by unlawful means, *to wit*:

> (a)    Defendants made multiple misrepresentations of fact to The Clients in an effort to cover up the theft of The Clients' funds;

> (b)    Defendants prepared, or assisted in preparing, for The Clients unauthorized and false tax returns; and/or

> (c)    Defendants exceeded the authority they had to utilize the

information contained in The Clients' computer systems in a manner that violates federal law.

239.    In furtherance of their conspiracy, Defendants made to The Clients, or agreed to have someone make on their behalf, the false statements of fact detailed above.

240.    In addition, Lorraine Weber purposefully failed to file resident income tax returns with the New York State Department of Taxation and Finance so she did not have to reveal her knowledge and enjoyment of monies stolen by WEBER in 2008 aggregating $152,000, in 2009 aggregating $174,700, and in 2010 aggregating $238,700.    Lorraine Weber committed this unlawful act as a means of covering up her participation in the theft of TARGUM's funds.

241.    When she did file income tax returns, Lorraine Weber knowingly underreported her family's taxable income to conceal her enjoyment of the stolen funds.    Any denial by Lorraine Weber that she knew her household income was being underreported to the appropriate taxing authorities is belied by the fact that she received multiple notices from the government alerting her of the government's awareness that she and WEBER had underreported their income, including: (1) Internal Revenue Service - Federal Tax Lien No. FT135904 in the amount of $76,976 (Dated: January 2, 2009); and (2) New York State Tax Commission - Warrant ID No. E-117290603-W001-3 in the amount of $41,890.62 (August 15, 2012).

242.    In fact, in the summer of 2011, Lorraine Weber spoke with TARGUM and, in the course of that conversation, questioned WEBER's business judgment.    Though not understood at the time, it is now believed that Lorraine Weber's comment was a direct reference to the Tax Fraud Enterprise.

243.    Similarly, members of WEBER and Lorraine Weber's family -- including CAMILERI and SHEILA WEBER -- accepted from WEBER and Lorraine Weber funds that they knew were illegally obtained from The Clients, and those family members likewise

remained purposefully silent in the face of fraudulent activity.

244.    As a direct and proximate result of Defendants' conspiracy, The Clients have suffered damage.

WHEREFORE, Plaintiffs demand entry of a judgment against defendants CITRIN COOPERMAN & COMPANY, LLP, a New York limited liability partnership; MATTHEW G. WEBER, an individual; VINCENT CAMILERI, as Representative of the Estate of SALVATORE CAMILERI, an individual; JOHN DOE NO. 1, an individual; LORRAINE WEBER, an individual; and SHEILA WEBER, an individual; jointly and severally, for an amount to be determined at trial, including an award of interest, costs, and such other relief as this Court deems just and appropriate.

## COUNT VIII – CONVERSION
### [AGAINST CITRIN AND WEBER]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 163 above, and further allege:

245.    At all times relevant hereto, The Clients were the lawful owners of the funds that were wired to CITRIN and WEBER to be paid to the various taxing authorities for The Clients' tax liabilities.

246.    CITRIN and WEBER have interfered with The Clients' ownership and interest in that money.

247.    CITRIN and WEBER have converted The Clients' money to their own personal use, thereby causing The Clients' damage.

WHEREFORE, Plaintiffs demand entry of a judgment against defendants CITRIN COOPERMAN & COMPANY, LLP, a New York limited liability partnership; and MATTHEW G. WEBER, an individual; jointly and severally, for an amount to be determined at trial,

Case No.: 12-cv-6909 (LTS) (SN)
ECF Case

including an award of interest, costs, and such other relief as this Court deems just and appropriate.

## COUNT IX – NEGLIGENCE
### [AGAINST CITRIN AND WEBER]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 163 above, and further allege:

248.    Pursuant to the agreement(s) and understandings identified in detail above, an accountant-client relationship existed between CITRIN/WEBER and The Clients.

249.    As The Clients' professional accountants, CITRIN and WEBER collectively owed a duty to The Clients to provide them sound, reliable advice and to refrain from making to them any false representations of fact in the course of handling their tax filings and rendering corporate advice in connection therewith.

250.    As explained in greater detail above, CITRIN and WEBER breached the duty they owed to The Clients.

251.    As a direct and proximate result of CITRIN and WEBER's breach of duty, The Clients have suffered damage.

WHEREFORE, Plaintiffs demand entry of a judgment against defendants CITRIN COOPERMAN & COMPANY, LLP, a New York limited liability partnership; and MATTHEW G. WEBER, an individual; jointly and severally, for an amount to be determined a trial, including an award of interest, costs, and such other relief as this Court deems just and appropriate.  Plaintiffs reserve the right to seek leave of court to assess punitive damages against CITRIN and WEBER, jointly and severally.

## COUNT X – NEGLIGENT RETENTION AND SUPERVISION
### [AGAINST CITRIN]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 163 above, and further allege:

252.    This is an action seeking damages based upon CITRIN's negligent retention and/or supervision of its management and/or employees, including but not limited to, those employees and agents of CITRIN who were responsible for, *inter alia*, preparing and filing all of The Clients' city, state, and federal income taxes.

253.    At all times material hereto, CITRIN knew or should have known that its employees and agents -- including WEBER, Vera Fici, Elda Solla, Thomas Grohs, Michael Lester, Gary Karlitz and/or JOHN DOE NO. 1 and others -- were engaging in activities that were improper and illegal, including but not limited to:

      (a)    ignoring CITRIN's own internal policies and procedures;

      (b)    violating regulations within the accounting industry and other prudent and sound practices and procedures within the accounting industry; and

      (c)    utilizing company resources (both human and non-human), including trackable computers, telephones, photocopiers, electronic mail servers, mailing accounts, and office space to service people who CITRIN now claims were never clients of the firm.

254.    Additionally, upon information and belief, CITRIN knew that WEBER's productivity and profitability as a Partner at CITRIN had plummeted and that, as a result thereof -- combined with the fact that WEBER was in financial distress -- WEBER and those with whom he worked at CITRIN needed an increased measure of supervision and monitoring to prevent the very type of fraudulent and illegal activity about which CITRIN's Partners write published articles and counsel their clients to install necessary preventative measures.

255.    Likewise, upon information and belief, CITRIN was well aware that WEBER had

previously been sued for accounting malpractice, which itself should have caused CITRIN to increase the measure of the firm's supervision and monitoring of WEBER and those who regularly worked under his direction.

256.    CITRIN had an obligation to investigate and monitor its Partners' and employees' activities; and, had it conducted even a reasonably diligent investigation, CITRIN would have discovered that its Partners and employees (including WEBER, JOHN DOE NO. 1, and others presently unknown) were, in fact, engaging in a scheme to defraud The Clients and the governmental taxing authorities to whom The Clients' false tax filings were submitted by CITRIN, WEBER, and his co-workers.

257.    CITRIN had a duty to take steps to prevent or rectify the improper activities and conduct of their Partners and employees and agents and to safeguard The Clients' funds and legal interests.  Such steps could have included:

(a)    suspending or terminating at an earlier date the employment of WEBER and those officers, employees and agents who contributed to and/or assisted in preparing and filing factually incorrect tax returns for The Clients and converting the money provided by The Clients to pay anticipated tax liabilities;

(b)    increasing supervision of those officers, employees and agents tasked with establishing, monitoring and maintaining CITRIN's computer databases and systems; and

(c)    suspending or terminating at an earlier date the employment of those officers, employees and agents tasked with establishing, monitoring and maintaining CITRIN's computer databases and systems.

258.    Rather than discharge its duties to The Clients, CITRIN turned a blind eye to, or failed to exercise reasonable means to discover and correct, active misconduct and negligence on the part of its Partners, employees, agents, and others and instead permitted them to:

(a)  file factually incorrect tax returns for The Clients;

(b)  defraud The Clients by telling them that tax returns had been filed on their behalf when no returns had actually been filed;

(c)  convert the money provided by The Clients to pay anticipated tax liabilities;

(d)  overlook the fact that CITRIN's computer databases were being misused and that "red flags" were waving in response to that wrongful conduct;

(e)  substantially assist WEBER and his co-workers in their fraudulent scheme.

259.   As a direct and proximate result of the negligent retention and/or supervision of its Partners and employees, agents, and others by CITRIN, The Clients suffered damages for which CITRIN is liable.

WHEREFORE, Plaintiffs demand entry of a judgment against defendant CITRIN COOPERMAN & COMPANY, LLP, a New York limited liability partnership, for an amount to be determined at trial, including an award of interest, costs, and such other relief as this Court deems just and appropriate.  Plaintiffs reserve the right to seek leave of court to assess punitive damages against CITRIN.

## COUNT XI – FRAUDULENT CONVEYANCE OF FUNDS
### [AGAINST WEBER, LORRAINE WEBER, CAMILERI, AND SHEILA WEBER]

Plaintiffs re-allege, and adopt by reference herein, Paragraphs 1 - 163 above, and further allege:

260.   WEBER transferred a portion of the monies The Clients wire transferred to the CITRIN-identified bank accounts, and other assets that he owned or in which he had interests, to the Weber Family Members (the "Weber Family Members Fraudulent Transfers"), with the actual intent to hinder, delay, or defraud The Clients.  Attached hereto as **Exhibit "X"** is a chart delineating payments made by WEBER to Weber Family Members from the CITRIN-identified

bank accounts to which The Clients had transferred their funds at WEBER's instruction.

261.    Members of WEBER and Lorraine Weber's family -- including CAMILERI and
Sheila Weber -- accepted from WEBER and Lorraine Weber funds that they knew were illegally
obtained from The Clients, and those family members remained purposefully silent in the face of
fraudulent activity.

262.    WEBER, Lorraine Weber, CAMILERI, and Sheila Weber are beneficiaries of the
proceeds that were wrongly misappropriated, converted, and stolen from The Clients.

263.    The payments noted in Exhibit "X" are but a small representative sample of the
illegally-obtained funds transferred from WEBER to Weber Family Members.    Upon
information and belief, additional transfers were made between 2006-2013 from WEBER to
Weber Family Members for their benefit, including payments to WEBER and Lorraine Weber's
son, Adam Weber.

264.    The Weber Family Members Fraudulent Transfers constitute fraudulent transfers
which should be avoided pursuant to New York Debtor & Creditor Law § 270, *et seq.*, and are
recoverable from the Weber Family Members, with interest and attorneys' fees.

265.    Any and all monies being held by, or for, WEBER or Weber Family Members
must be held in trust for the benefit of The Clients, as WEBER and the Weber Family Members
are not entitled to the benefit of wrongfully misappropriated, converted, and stolen funds.

WHEREFORE, Plaintiffs demand entry of a judgment against defendants, MATTHEW
G. WEBER, an individual; LORRAINE WEBER, an individual; VINCENT CAMILERI, as
Representative of the Estate of SALVATORE CAMILERI, an individual; and SHEILA
WEBER, an individual; for an amount to be determined at trial, including an award of interest,
costs, attorneys' fees, recovery from the Weber Family Members of fraudulently transferred

funds, and such other relief as this Court deems just and appropriate.  Plaintiffs reserve the right to seek leave of court to assess punitive damages against WEBER.

## PLAINTIFFS' DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Respectfully submitted,

**SILVER LAW GROUP**
11780 W. Sample Road
Coral Springs, Florida 33065
Telephone:     (954) 755-4799
Facsimile:     (954) 755-4684

By:   _/s/  Scott L. Silver_
      SCOTT L. SILVER
      E-mail:  SSilver@silverlaw.com
      DAVID C. SILVER
      Admitted *Pro Hac Vice* [DE 15]
      E-mail: DSilver@silverlaw.com
      JASON S. MILLER
      Admitted *Pro Hac Vice* [DE 16]
      E-mail: JMiller@silverlaw.com

     - and -

      RUSSELL M. YANKWITT
      E-mail:  Russell@yankwitt.com
      CRAIG M. CEPLER
      E-mail:  Craig@yankwitt.com
      **YANKWITT & MCGUIRE, LLP**
      *Co-Counsel for Plaintiffs*
      140 Grand Street - Suite 501
      White Plains, NY 10601
      Telephone:     (914) 686-1500
      Facsimile:     (914) 801-5930

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a copy of the foregoing was filed with the Clerk of Court on this __24th__ day of June 2013 and that a copy will be sent <u>via</u> <u>electronic</u> <u>mail</u> <u>only</u> to: **JOHN K. CROSSMAN, ESQ.; FRANK C. WELZER, ESQ., and SCOTT J. WATNIK, ESQ.**, ZUKERMAN GORE BRANDEIS & CROSSMAN, LLP, *Counsel for Defendant, Citrin Cooperman & Company, LLP*; Eleven Times Square, New York, NY 10036; **KEVIN T. KEARON, ESQ.**, BARKET, MARION, EPSTEIN & KEARON, LLP, *Counsel for Defendant, Matthew G. Weber*, 666 Old Country Road - Suite 700, Garden City, NY 11530; and **JONATHAN SCHWARTZMAN, ESQ.**, CORDOVA & SCHWARTZMAN LLP, *Counsel for Defendant, Lorraine Weber*, 666 Old Country Road, Garden City, NY 11530; <u>and</u> <u>will</u> <u>be</u> <u>served</u> <u>upon</u> <u>the</u> <u>following</u> <u>parties</u> <u>in</u> <u>accordance</u> <u>with</u> <u>Fed.R.Civ.P. 4</u> <u>or</u> <u>as</u> <u>otherwise</u> <u>agreed</u>: **SHEILA WEBER**, 87 Kirkwood Street, Long Beach, NY 11561; and **VINCENT CAMILERI, as Representative of the Estate of SALVATORE CAMILERI**, 428 Wanamaker Street, Oceanside, NY 11572.

_/s/ Scott L. Silver_
SCOTT L. SILVER